Butler, District Judge.
The libelant, at 2:30 a. m. of February last* was lying at anchor in the Chesapeake bay, a few miles northwest of Cape Henry. The tide was running up strong; the wind, which was from southwest, was so light that she was virtually becalmed, and had anchored in consequence. Her stern swung with the tide, bringing her head nearly south. The foresail, mainsail and spanker were up, the booms hauled in amidships between the masts and properly secured-All other sails were down.
The customary anchor light, hanging from the forestay sail halyards* was burning brightly; and an anchor watch was in charge. ,
*883 The steamer Orion, towing three large ocean barges, astern, attached by hawsers, each of about 150 fathoms,—covering a distance of two thirds of a mile, or more—and proceeding on a westerly course, ran so near the libelant, as to bring the second barge, the Oakland, into collision with her, carrying away her bowsprit, jib boom, and headgear generally. When the libelant’s light was seen by the steamer, which was not until she was close at hand, the latter turned off southward, and passed 100 to 200 yards away, carrying the barge next her safely by. Very soon, however, she turned northwestward and resumed her original course, and the Oakland was carried against the libelant, as stated. The rear barge, on seeing the collision, cut her hawser, and ran with the tide under the libelant’s stern. The steamer, in ignorance of the accident, or the loss of the barge, continued her course.
The defense set up is that the schooner’s light was hidden by the sails, and was consequently not seen until so near that the collision was inevitable; and that the libelant is .blamable for leaving her sails up without displaying an additional light where it could not be obscured. This defense is not, in my judgment, sustained by the proofs. The libelant took all precautions usual to the circumstances, or required by a proper regard for the safety of herself and others. The weight of evidence in this respect is clearly with her. The failure to see her light earlier was, in my judgment, the result of negligence. The witnesses from the steamer testify that a vigilant lookout was maintained, and that no light could he seen until the schooner was close at hand, and her sails were visible. I cannot however believe this in view of other testimony, and of well-established facts which seem to prove the contrary. These witnesses are interested, swearing to exculpate themselves. I have yet to meet with an instance of collision where witnesses from the vessel in fault did not testify to a faithful discharge of their duties, and to the faultlessness of the vessel. I attach no importance to what is said by the witnesses from the barges, in this respect. These vessels seem to have been aÜQwed to take care of themselves, having no proper lookout and being permitted to float with the tide, at the end of a long hawser, and at great distance from the steamer.
That the steamer’s conduct was negligent, generally, seems to be demonstrated by the fact that she did not know anything of the collision, or the loss of a barge, until an hour and a half later, and then discovered it only through another accident. It was her duty to maintain a lookout rearward, as well as forward, under the circumstances; and yet, notwithstanding what her witnesses say, it is manifest that this duty was entirely neglected. Furthermore she turned back to resume her original course while two thirds of her long string of boats was on the other side of the schooner. This last statement is, I believe, fully justified by the proofs. Her officer in charge says she turned northwestward soon after her sheer to the southward; when neither he, nor any one else on board, knew whether the barges had passed or not, for they were not observing these vessels, and, as we have seen, were unaware of the colli *884 sion or the loss, of one of them. The testimony of the Oakland’s master and the schooner’s anchor watch is, substantially, that the steamer’s turn northwestward was before the Oakland had passed. It is admitted the schooner’s light was burning brightly. If hidden by the standing sails from anybody it must have been from one approaching from her rear, or well over in that direction. But, with the light air then astir, (it could hardly be called a wind) the “bellying” of the sails must necessarily have been slight and unsteady, so that if hidden to one approaching from this direction, it would be but momentarily. I am not unmindful of what the respondents’ witnesses say-about the wind, but the fact that the schooner was at anchor for want of wind, of itself outweighs this testimony.
The statement of Holm, who was on the rear barge, the Merryman, that he saw the schooner’s sails filled and swelling out, as he sheered under her stern, is unworthy of belief. It is incredible that he should have been so observant of a fact that did not then interest him, at a time when his undivided attention was required to save himself and his vessel. The master of the Merryman was also asked about this, but, while evidently disposed to support Holm, he is unable to do it. His examination and answers were as follows:
“Question. Could you see the sails of the schooner as she passed you? Answer. Yes, sir. Q. Were they full or shaking? A. I could not tell exactly, but I think, they were a little mite full. I could not tell exactly. She was pretty near head to the wind, they might have been a little mite out, but was very trifling. I did not take particular notice of that. ”
But, as we have seen, the steamer did not approach from the rear, or anywhere near that direction. We cannot with entire exactness know how the schooner headed, but it is admitted to have been southward. With the steamer’s course westward, or a little south, as she states it, the schooner’s sails could not hide her light. Furthermore it seems clear that the steamer saw the light in time to pass her tow safely, and would have done so if she had turned further southward, and held this course. The testimony of her officer in charge sustains this view. He did not go further south because, as he says, he believed the sheer made sufficient for safety. It carried him and the first barge past; and had he not returned to his original course when he did, it is probable the collision would have been avoided. There was nothing in the way, however, of his going further south. He did not because he deemed it unnecessary. This was a fault of judgment, for which his vessel is responsible. He says he was unaware of the state of the tide, which tended to carry the barge upward. This was inexcusable ignorance, for which also his vessel must answer.
The faults of the Orion were numerous, the principal of them being: First, in taking such a tow across the bay—a tow more than twice its proper length, and consequently unwieldy and dangerous—but for which it might probably, even with the other faults committed, have passed safely, as the first barge did. That such tows may be proper in the *885 open sea does not tend to excuse their existence in the bay, where vessels are encountered, in motion and at anchor, continually. Second, in failing to see the schooner’s light earlier, and keeping further off. Third, in failing to turn further southward when she did see it. Fourth, in turning back to her original course while two of the barges were on the other side of the schooner.
The liability of the Oakland is equally clear. She might indeed,be condemned on the steamer’s testimony alone. As before stated, she was without a proper lookout, and was allowed to drift with the current. With her great length of hawser she could by proper vigilance have so controlled her course as to pass without colliding, notwithstanding the steamer’s faults. The testimony from the steamer justifies this view. As, however, the steamer and this barge, I am informed, belong to the same owners, the result must be the same whether one or both be condemned. I have said sufficient to indicate my reasons for the decree about to be entered, and will not therefore pursue the subject further.