THE MINNIE.

(Circuit Court of Appeals, Fourth Circuit.    February 6, 1900.)

No. 312.

1. COLLISION—EVIDENCE.
     A steam tug, with two barges,—the tow being about half a mile long,— was entering the Roads at Fortress Monroe, before daylight, for the purpose of anchoring, when the barges struck and sunk a schooner at anchor. The wind was blowing 20 miles per hour, the tide was in flood, and a snowstorm had been raging. The master of the tug saw the schooner when about 400 feet abeam, but did not change his course. The schooner was in the usual anchoring place for vessels seeking shelter from storms. The tug had passed several places where it could have safely anchored and shortened its hawsers.   *Held*, that the tug was in fault.

2. SAME.
     When the master of a tug passing an anchored schooner saw the latter in time to have avoided the collision which followed, but neglected to change its course, the fact that there was an absence of a proper anchor watch on the schooner will not relieve the tug from liability.

3. COLLISIONS—PRESUMPTIONS—BURDEN OF PROOF.
     Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is of itself sufficient to account for the collision, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. Its own negligence being established, it is required to prove the other's fault with equal clearness.   A reasonable doubt in regard to the conduct of such other vessel should be resolved in its favor.

Appeal from the District Court of the United States for the Eastern District of Virginia.

Samuel Park and Floyd Hughes, for appellant.

R. G. Bickford and Robert M. Hughes (T. S. Garnett, on brief), for appellee.

Before SIMONTON, Circuit Judge, and PAUL and WADDILL, District Judges.

WADDILL, District Judge.   This is an appeal from the decree of the district court of the United States for the Eastern district of Virginia, entered on the 29th of March, 1899, carrying out a former decree of the 2d of May, 1898, which determined the question of fault, entered by Hon. WILLIAM H. BRAWLEY, United States district judge for the district of South Carolina, then holding, under special assignment, the United States district court for the Eastern district of Virginia.   The collision which is the subject of this appeal occurred between the schooner John C. Haynes and the tow of the steam tug Minnie on the morning of February 7, 1895, at 5:10 o'clock, at a point from one-half to three-fourths of a mile southwest of the wharf at Fortress Monroe.   The schooner John C. Haynes was at anchor at the point of collision, heading about northeast, when the Minnie, heading about southwest, with two barges, the Volunteer and the Puritan, coming into the Roads to anchor, came into collision with said schooner, by the starboard main rigging of the Volunteer striking the end of the jibboom of the vessel, and the Puritan striking

her on her port bow, from which injury she sank, and proved a total loss. The faults alleged against the tug and tow by the libelants are, briefly, insufficiency of officers and crew, inefficient lookout, unsafe length of tow, taking a course too near to said schooner, and negligence in navigation. The faults alleged against the schooner are the failure to keep a proper and efficient lookout or anchor watch; failure to ring her bell or give any warning as she was required to do in a fog or thick weather, such as is alleged to have existed at the time of the collision, in order that her whereabouts might be known. A great mass of evidence was taken in the case, and the district court held the tug Minnie to be solely in fault, dismissed the libel against the barges, and gave judgment in favor of the libelants for the sum of $25,000, being the agreed value of the tug, ascertained in the limited liability proceeding instituted by the claimant in connection with said libel.

The claimant earnestly insists that it should not be held liable for this collision, because the schooner was anchored, as it claims, in the pathway of the roadstead of ingoing steamers to Newport News, where it should not have been, and, being so situated, should have exercised the utmost diligence to have averted danger to others in the lawful navigation thereof. It particularly claims that said vessel, in such a position, should have maintained a proper lookout, and, because of the condition of the weather, have sounded its fog signals, in order to avoid collision, and that its failure so to do solely caused the collision. This position is based upon the theory that the schooner was where it should not have been, and that the condition of the weather was such as to require the vessel, in addition to having up its regular anchor light, to ring its fog bell. The lower court decided each of these propositions adversely to claimant's contention. The place where the vessel was anchored was a well-known place of refuge for shipping of all kinds in bad weather; was within but a short distance of where claimant, with tug and tow, purposed to anchor, and where some dozen or more vessels had already anchored; and was generally known as an anchorage ground for mariners navigating the waters of the Atlantic coast and Chesapeake Bay. While under the present law it is not permissible to anchor just there, at the time of the collision almost the very spot had been judicially determined by the courts to be a proper place. The J. W. Everman, 2 Hughes, 24, 25, 28, 29, Fed. Cas. No. 7,591. This case was subsequently taken on appeal to the circuit and supreme courts, and affirmed in each court. The schooner was not required to do more than maintain its regular anchor light, except upon the theory that the weather was such that, under rule 15 (section 4233 of the Revised Statutes), it should sound its bell. The rule provides:

"Whenever there is a fog or thick weather, whether by day or night, fog signals shall be used as follows: * * * Steam vessels and sail vessels when not under way shall sound a bell at intervals of not more than five minutes."

There seems to be nothing in this case to sustain the theory of the existence of a fog at the time of the collision, but the contention is

100 F.—9

that, because of the prevalence of a snowstorm, the weather was such as to require the sounding of a bell, under the rule in reference to thick weather. At most, this would depend upon whether or not, either from the snowstorm or otherwise, the condition of the weather was such as to obscure the vessel's light at the time of the collision. Upon this question there is great conflict in the evidence, but the district court decided (and it seems to us clear from a preponderance of the evidence) that, while a snowstorm had existed up to a short time prior to the collision, it had shortly theretofore stopped snowing, and that, however thick the weather may have been at other places in and about Hampton Roads, there was no reason why the light of this vessel should not have been seen by all persons exercising proper diligence on their part. The witnesses examined from the officers and crew testify to this effect; the lighthouse keeper at Old Point, and the officers and others examined from quite a number of vessels lying in the immediate locality, so testify; and the circumstance that none of the other vessels then at anchor, with one exception, as well as the lighthouse keeper near the point of collision, were sounding their bells on account of the condition of the weather, goes far to establish the contention of those in charge of the schooner. No obligation existed to ring the bell, in the absence of fog or thick weather, and the court should not add such additional requirement. The Oregon, 158 U. S. 203, 15 Sup. Ct. 804, 39 L. Ed. 943. From this evidence, we are satisfied that the condition of the weather did not make it necessary; and, indeed, it is not at all certain that anything would have been accomplished by the ringing of the bell. Those in charge of the schooner testified that they saw the tug and tow about a mile off, and, as soon as apprehensive of any danger of collision, endeavored, by hailing them, to avoid it, but received no reply. It is by no means certain that this hailing was not quite as effective as the ringing of a bell would have been; for the lookout on the tug seems never to have given any notice at all of the schooner, if he ever saw her. The captain of the tug, who observed the vessel some 400 feet away, seems to have been the first one to have seen the schooner, according to claimant's evidence.

The collision in this case being between a steam tug in motion and a sailing vessel at anchor, at least the presumptions are all favorable to the stationary vessel, if the burden of proof in accounting for the accident is not actually thrown upon the moving craft. Vessels propelled by steam are required to take all possible care, and use, if necessary, all the means they possess, to keep clear of sailing vessels; and a vessel in motion is bound, if possible, to steer clear of a vessel at anchor. In The Oregon, supra, Mr. Justice Brown, in discussing the question of presumptions where a party clearly shown to be at fault sought to impugn the management of the other vessel, said that they were all favorable to the latter, and that "this principle is peculiarly applicable to the case of a vessel at anchor, since there is not only a presumption in her favor, by the fact of her being at anchor, but a presumption of fault on the part of the other vessel, which shifts the burden of proof upon the latter." The Victory and The Plymoth-

ian, 168 U. S. 410, 18 Sup. Ct. 149, 42 L. Ed. 519; American Dredging Co. v. The Bedowin, Fed. Cas. No. 299; The City of New York, Fed. Cas. No. 2,759; The Duchess, Fed. Cas. No. 4,205; The Lincoln, Fed. Cas. No. 8,354; The Rockaway (D. C.) 19 Fed. 449; The Le Lion (D. C.) 84 Fed. 1011.

Among the faults alleged by the libelants was the undue length of the tow, the use of hawsers unnecessarily and dangerously long, and the failure of the navigators of the tug and tow to shape their course so as to avoid collision with vessels at anchor. It was the plain duty of the navigators of the tug and tow, under the circumstances of this case, coming into a crowded harbor, to use extraordinary care to avoid collision with vessels lawfully at anchor or otherwise therein. The utmost vigilance should be required of a vessel entering a harbor in the nighttime, and particularly if it be one much resorted to as a place of refuge in bad weather. The master and crew should be on duty, and in such parts of the vessel as to be able to control her movements, and to see any object that lies in her track. The Louisiana v. Fisher, 21 How. 1, 16 L. Ed. 29; New York & Baltimore Transp. Co. v. Philadelphia & S. S. Nav. Co., 22 How. 461, 16 L. Ed. 397; Haney v. Steam-Packet Co., 23 How. 287, 16 L. Ed. 562; Sturgis v. Boyer, 24 How. 110, 16 L. Ed. 591; The Ariadne, 13 Wall. 475, 20 L. Ed. 542. The full length of the tug and tow in this case was some 2,500 feet, or about half a mile; the hawsers to the first barge being some 200 fathoms in length, and the second 150 fathoms; the barges each 180 feet long, and the tug 115 feet. While the failure to shorten hawsers may have been a distinct fault, from which liability ought to follow, still we do not feel it necessary to pass upon that question (The Ludvig Holberg, 157 U. S. 70, 15 Sup. Ct. 477, 39 L. Ed. 620), or to base our conclusions on its correct determination; but certainly the fault alleged is greatly aggravated by reason of the circumstances. The navigators of the tug and tow were experienced seamen, and familiar with the fact of Hampton Roads being a well-known harbor of refuge for shipping of all kinds in cases of storms at sea or on Chesapeake Bay, and that the track taken by them in entering and passing into the Roads was immediately through the anchorage ground, where, during such weather, large numbers of vessels might naturally be expected, and as a matter of fact were anchored. The wind at the time was northeast, with velocity of about 20 miles an hour. The tide was flood, and a heavy snowstorm had been raging through the night and up to about the time of the collision, and, according to claimant's contention, then continued. The hour was 5:10 of an early February morning. Indeed, every circumstance seemed to have combined to require the utmost care and caution of those in charge of the tug and tow in entering the said harbor, and to admonish them of the extreme danger of so doing, if, as a matter of fact, it was possible to have done so at all with safety under the circumstances. We think it fairly deducible from the facts of this case that the length of the tow, and its consequently unmanageable character, greatly increased the chances of, if it

did not actually bring about, the collision. We quite agree with what the learned judge of the lower court said in this regard, viz.:

"In undertaking to tow these barges, in a roadway where the presence of shipping was reasonably expected, with a hawser so long that it was practically unmanageable,—with tows liable at all times to a sudden sheer, putting in jeopardy all anchored vessels, which were helpless to protect themselves,—I am of opinion that there was a lack of that caution and foresight which the law demands of vessels navigated by steam; and, in so far as the testimony of the claimant is to be believed,—that the weather was so thick as to prevent the visibility of lights,—there is an aggravation of his carelessness. With such a wind and tide, it seemed to be sheer recklessness, and a trusting to luck, which call for condemnation."

The fact that convenience and speed are prompted by the length of the hawser is not a sufficient answer. The rights of passing shipping are to be considered before any mere convenience that may arise from expedition. Spencer, Mar. Coll. § 1128; The Nettie (D. C.) 35 Fed. 615; The John H. May (D. C.) 52 Fed. 882; The Percy Birdsall v. The Invertrossacks and The James McCaulley (D. C.) 55 Fed. 683; The Robert Holland and The Parana (D. C.) 59 Fed. 200.

It is claimed by the libelants that those in charge of the tug and tow were negligent in shaping their course so as to bring them into such close proximity to the anchored vessel. This we think may be conceded, under the circumstances surrounding this case, assuming that the whereabouts of the Haynes was known. Those in charge of the tug positively deny this. The master of the tug testifies that the schooner was first seen when abeam a-starboard about 300 to 400 feet off, and that the tug's lookout never reported the presence of the vessel, if he ever saw it, and that he did not change his course, but continued to steer right along, without thinking of any collision, and did not anticipate the least danger of the barges in tow going afoul of the anchored vessel. It is as to the conduct of those navigating the tug and tow after discovering the vessel at anchor that we shall address ourselves, rather than to what they should have done in shaping their course to keep off when they should have seen her. Just why the master of the tug should have apparently been so oblivious as to his surroundings and the dangers of the situation upon finding a vessel at anchor within three to four hundred feet off his bow, with a tow nearly half a mile in length, and wind and tide both sweeping it into inevitable collision with the stationary object, is hard to perceive. That the first barge would have come into collision with the vessel is precisely what he ought to have known, and should have anticipated, if he kept his course, as he says he did, and that a collision would occur with one or the other of the barges was manifest to one ever so inexperienced. The duty of the master of the tug to promptly put his helm hard a-starboard on discovering the Haynes at anchor on his starboard bow in such close proximity to him, and exert every possible effort to avoid the impending collision, was so manifest that its omission cannot be excused or palliated, particularly when the failure resulted in bringing about the accident; and, if it be said that with this effort the collision would nevertheless

have occurred, it at least does not lie in the mouth of those whose duty it was to do all in their power, and who confessedly did nothing, to make this contention.

In The John H. May (D. C.) 52 Fed., at page 884,—a case occurring in these waters, and in some of its important features like the one under consideration,—in discussing the failure of a steamer to keep out of the way of a vessel at anchor, Judge Butler said:

"He did not go further south, because, as he says, he believed the sheer made sufficient for safety. It carried him and the first barge past; and, had he not returned to his original course when he did, it is probable the collision would have been avoided. There was nothing in the way, however, of his going further south. He did not because he deemed it unnecessary. This was a fault of judgment, for which his vessel is responsible. He says he was unaware of the state of the tide, which tended to carry the barge upward. This was inexcusable ignorance, for which, also, his vessel must answer."

The Britannia, 153 U. S. 134, 14 Sup. Ct. 795, 38 L. Ed. 660; The City of Springfield (D. C.) 29 Fed. 923.

The lower court held that there was a safe anchorage ground to which this tug and tow could have put in, either under the lee of Cape Charles, before entering the roadstead, or near the Thimble, where two vessels were at anchor, and near to which this tow passed. If there was a safe anchorage ground, or a place at which, if not anchoring, the tug could have stopped and shortened its hawsers, and the better have gotten its tow under control, it would seem, under the circumstances of this case, the commonest prudence would have dictated its being done. That there was such anchorage ground there can be no doubt, and the tug and tow should have been anchored there in safety, as other vessels had done, instead of attempting to come in and endanger the shipping then in the roadstead. "It is no valid excuse for proceeding down the river, that when off Thirteenth street it was impossible to know the width of the gangway through which the vessel must pass to get into the East river, because it was easy to tell, even at that distance, that the river at the Battery was full of vessels, and, therefore, in the state of the tide, dangerous to navigate with such a fleet of boats. In view of the magnitude of the tow, the admitted danger of handling it in a strong ebb tide, where there is a large amount of shipping, and the ability to stop where the tow could be managed, it was, to use the mildest terms, negligence to make the attempt to pass the Battery into the East river. As the master could have stopped anywhere above Thirteenth street, it was his duty, under the circumstances, to have done so, and either to have divided his tow, or remain there until the tide had slacked." The Syracuse, 12 Wall. 172, 173, 20 L. Ed. 382.

Claimant insists that there was the absence of a proper anchor watch or lookout on the vessel, and that that brought about the collision, as such lookout could in some way (just how, it is not apparent) have averted the disaster. Without discussing the duty or necessity of the Haynes, while at anchor, to have a lookout (The Clarita and The Clara, 23 Wall. 13, 23 L. Ed. 146; Mercer v. The Florida, 3 Hughes, 490, 491, Fed. Cas. No. 9,433; The McCaldin [D. C.] 35 Fed. 333), or whether she actually had one or not, we do not

see that the fact is at all material to the correct determination of the issues involved, as the presence of a lookout would not have materially affected the result. There was nothing he could have done. The tug's master, according to his statement, saw the vessel in ample time to pass it in safety without changing his course; and it will not be presumed that he would have paid attention, one way or another, to what a lookout might have said or done, assuming that he could have made himself heard further than the anchor light was seen. It is not sufficient for the claimant to cast a doubt upon the management of the Haynes. The negligence of the towboat being clearly established, it is but reasonable that it should be required to establish the former's fault with equal clearness. The Oregon, 158 U. S. 197, 15 Sup. Ct. 804, 39 L. Ed. 943, supra. "Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is of itself sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption, at least, adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor." The City of New York, 147 U. S. 85, 13 Sup. Ct. 211, 37 L. Ed. 84.

From our view of this case, the collision was not brought about because of the Haynes' place of anchorage, or its failure to keep a lookout or ring its fog bell, but by reason of the tug improperly attempting to come in with an unmanageable tow, and the failure to properly navigate the tug and tow after observing the obstruction in its pathway, or near thereto. The decree of the district court, for these reasons, is affirmed.