## THE JOHN H. STARIN.

(District Court, D. Connecticut. January 14, 1902.)

### No. 1,308.

**1. COLLISION—STEAMER AND ANCHORED VESSEL—EXCESSIVE SPEED IN HARBOR AT NIGHT.**

The steamer John H. Starin, while passing down New Haven harbor about 11 o'clock at night, near the center of the channel, which was there 800 feet wide, and at a speed of 12 knots, came into collision with the anchored schooner Gurney and sunk her. *Held*, that the steamer was in fault for violation of the rule requiring her to keep to the right side of the channel, and because she was going at a dangerous speed, in view of the known fact that it was the custom of vessels to anchor in any part of the harbor, and that a number of vessels were then anchored therein, and further because, under the evidence, if she had kept a proper lookout she should have seen the schooner for a mile or more.

**2. SAME—CONTRIBUTORY FAULT—PRESUMPTIONS.**

Under the rule that, where the fault of one vessel for a collision is clearly established, she must establish the contributory fault of the other by evidence equally clear, and that every presumption will be indulged in favor of the latter, where there was evidence showing that a light was burning on an anchored schooner half an hour or less before she was struck and sunk by a passing steamer, which was clearly in fault, it will be presumed that such light was burning at the time of collision.

In Admiralty. Suit for collision.

Carpenter & Park, for libelants.

Henry G. Newton, Ward Church, and Harrison Hewitt, for claimant.

TOWNSEND, District Judge. At about a quarter before 11 on the night of October 18, 1900, the side wheel passenger steamboat John H. Starin, 200 feet long, while proceeding down New Haven harbor on her way to New York, struck the schooner Allan Gurney, 95 feet long, on the starboard side of her bow, and caused her to sink. The channel is about 800 feet wide at this point. The Starin was heading a little west of south, and going at full speed, about 12 knots an hour over the bottom, near the middle of the channel, in the usual course of the New York steamboats. The schooner was anchored in the usual anchorage ground for vessels in New Haven harbor, and was headed about northwest. That the Starin was in fault is clear from the testimony of her own witnesses. They assert that a dark cloud temporarily obscured the sky at about the time of the collision; that it was more difficult to see lights on vessels when thus going out of the harbor than when coming in. They admit that vessels have for 20 years anchored anywhere in New Haven harbor; that they had already passed a number of vessels in going down the harbor; and that when they first sighted the schooner, 200 feet away, it was impossible to avoid a collision. The Starin, without excuse, violated the statutory rule that steam vessels shall keep on the right-hand side of the channel. She was proceeding down a crowded harbor at a confessedly dangerous speed under the existing conditions,—a speed inconsistent with the safety

of other vessels. The City of Paris, 9 Wall. 638, 19 L. Ed. 751; The Syracuse, 9 Wall. 676, 19 L. Ed. 783. Furthermore, the testimony of the disinterested witnesses and of the witnesses for libelant is to the effect that it was a clear night, so that vessels could be seen for a mile or more, regardless of lights, and that the schooner had one or both of her sails up, reefed. The Starin, having elected to take the center of the channel, failed to use vigilance as to lookout or speed, or both, sufficient to guard against collision. The conclusion reached is that the Starin was at fault. The Starin not only denies that it was in fault, but it contends that the schooner Gurney was in fault, because, first, although thus anchored near the center of the channel in the known path of New York steamboats, she had no lookout on deck. It does not appear that such a watch is required when there is a sufficient light, or that the presence of such a lookout could have prevented the collision.

It is further claimed that, although the schooner had a lantern in her fore rigging, it was not burning at the time of the collision. The Starin's witnesses swear that no light was visible. The schooner's witnesses swear that the light was burning prior to, and at the time of, the collision. Their testimony as to the light at the moment of collision is somewhat indefinite, owing to the fact that the mate went down with the schooner, and the captain was obliged to jump overboard. In addition to the evidence of interested parties as to lights, there is the evidence of three apparently disinterested witnesses. Knight, pilot of a steam tug, was anchored about a quarter of a mile from the schooner Gurney on the night in question. He testifies that he saw the light on the Gurney when she was a mile and a half away, and again when he passed her. It is not clear whether he saw the light later than 30 minutes before the collision. Springer, the watchman on board the Connecticut Naval Brigade transport, testifies that he was anchored about three-quarters of a mile from the Gurney; that she had a bright light; that he went off duty a little after 12 o'clock; that about an hour before this he "noticed a change in the light of one of the schooners [the Gurney]. It seemed lower towards the water." He noticed this change about an hour after he first saw the Gurney's light. It is agreed that, after the Gurney sank, a light was thus located in her fore rigging. Blake, a watchman of oyster beds, swears that he was going up and down the harbor that night, and that he saw the Gurney's light burning some 15 or 20 minutes before he saw her going down. It is thus sufficiently established that a proper anchor light was burning on the Gurney some 20 or 30 minutes prior to the collision. There is no satisfactory evidence that it continued to burn up to the time of the collision. To rebut the presumption of such continuance, claimants have shown that the regular cook, whose business it was to keep the lantern cleaned and filled, had left two or three days before, and that there is no evidence that the lantern had been filled since; the only evidence on this point being that of the mate of the Gurney, who testified that he hung the lantern in the rigging that night, and when asked, "Where did you get it from to hang it there?" said, "The cook lights and cleans

it and passes it to me, and I hang it up." There was another cook on board on the voyage in question, but counsel stated that he had made such overtures to both sides that his testimony would be unworthy of credit, and for this reason it was not, taken. In these circumstances, it must be found that a proper anchor light was burning on the Gurney at the time of the collision. Where a vessel clearly shown to be at fault seeks to impugn the management of the other vessel, all the presumptions are favorable to the latter. The Oregon, 158 U. S. 203, 15 Sup. Ct. 804, 39 L. Ed. 947. "Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is of itself sufficient to account for the collision, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. Its own negligence being established, it is required to prove the other's fault with equal clearness. A reasonable doubt in regard to the conduct of such other vessel should be resolved in its favor." The Minnie, 40 C. C. A. 312, 100 Fed. 128.

Let a decree be entered in favor of libelants.