## THE CHARLES E. MATTHEWS.

### THE NARRAGANSETT.

#### (District Court, S. D. New York. June 10, 1904.)

1. COLLISION—ANCHORED VESSEL AND SCOW IN TOW—FAILURE OF TUG TO ALLOW SUFFICIENT ROOM—ANCHORING IN CHANNEL.

A tug coming in from the dumping grounds with two empty scows in tow, strung out on a hawser, during a storm and high wind, which drove the scows to the westward from the course of the tug, *held* in fault for a collision between one of the scows and a steamship anchored in Lower New York Bay, on the ground that she failed to make sufficient allowance for the swing of her tow, for which there was ample room. The steamship also *held* in fault for remaining anchored in the channel after the necessity which caused her to anchor there had ceased to exist, in violation of the harbor regulations.

In Admiralty. Suit for collision.

Carpenter, Park & Symmers, for libellant.
Butler, Notman, Joline & Mynderse, for the Charles E. Matthews.
Wing, Putnam & Burlingham, for the Narragansett.

ADAMS, District Judge. This action was brought by the Taylor Dredging Company, as owner of Dumping Scows No. 6 and No. 10, to recover the damages received by the scows through stranding on the south shore of Staten Island after collision with the steamship Narragansett, about noon, on the 16th day of September, 1903.

The scows were returning light, in tow of the tug Charles E. Matthews, after dumping their loads at sea. No. 6 was on a hawser of about 125 fathoms and No. 10 tailed behind on a hawser of about 80 fathoms.

The Narragansett, a large steamship, just in from sea, was anchored in the channel about opposite Swinburn Island, heading about East South-east, in consequence of a strong wind from that direction, notwithstanding a flood tide.

The strong wind commenced while the tow was outside, 5 or 6 miles away from the place of collision, and increased as it came inside. At first there was a drizzle of rain which increased to a storm rendering the discernment of objects a short distance away, practically impossible, except for occasional lulls. The speed of the tow

was at first about 5 miles, which decreased to 2 miles, notwithstanding the exertion of the tug's full power. The effect of the wind was to tail the tow off to the westward several points, so that the tow was going sidewise to some extent and thus occupied several hundred feet in its progress instead of the width of the tow, not exceeding 50 feet, which it would ordinarily occupy.

The tow was without anchors and altogether dependent upon the tug for safety.

The allegations of fault, now insisted upon, against the Matthews are that she did not allow sufficient margin in passing the steamship; and that she did not keep a proper lookout.

As against the Narragansett, it is claimed that she was improperly anchored in the channel.

With respect to the tug, the evidence requires me to sustain the charge that she did not allow sufficient margin in passing. It is doubtful if the steamship could have been seen before, owing to the weather, but she was seen in time for the tug to have proceeded further to the eastward, for which there was ample room and evident necessity. The tug master, however, did not take into sufficient account the tailing of his tow to the westward. This was easily determinable by the bearing of the first scow, which was plainly in sight, there being a let up in the storm at this time. The bearing of the first scow was sufficient to notify him that there was danger for the second one, unless there was ample room allowed for her to clear the anchor chain, as well as the steamship. Instead, however, of taking any steps to that end, a north course of the tug was kept. The master accounts for the collision with the chain by its being raised just at the time the second scow was passing, in consequence of a puff of wind sending the steamship back upon the chain, but if that caused the collision, it should, under the circumstances, have been anticipated and provided against. This method of towing, as I have recently had occasion to remark, imposes upon the tug the utmost exactness in the performance of her duty—The New York Central No. 22 (D. C.) 124 Fed. 750, 752—and in view of the tug's failure to use her helm sufficiently at the proper moment, I think she should be held. A similar question was under consideration in The Minnie, 100 Fed. 128, 40 C. C. A. 312, by the Circuit Court of Appeals for the Fourth Circuit, and in holding the tug, it was said (page 132, 100 Fed., page 317, 40 C. C. A.):

"It is claimed by the libellants that those in charge of the tug and tow were negligent in shaping their course so as to bring them into such close proximity to the anchored vessel. This we think may be conceded, under the circumstances surrounding this case, assuming that the whereabouts of the Haynes was known. Those in charge of the tug positively deny this. The master of the tug testifies that the schooner was first seen when abeam a-starboard about 300 to 400 feet off, and that the tug's lookout never reported the presence of the vessel, if he ever saw it, and that he did not change his course, but continued to steer right along, without thinking of any collision, and did not anticipate the least danger of the barges in tow going afoul of the anchored vessel. It is as to the conduct of those navigating the tug and tow after discovering the vessel at anchor that we shall address ourselves, rather than to what they should have done in shaping their course to keep off when they should have seen her. Just why the master of the tug should have apparently

been so oblivious as to his surroundings and the dangers of the situation upon finding a vessel at anchor within three to four hundred feet off his bow, with a tow nearly half a mile in length, and wind and tide both sweeping it into inevitable collision with the stationary object, is hard to perceive. That the first barge would have come into collision with the vessel is precisely what he ought to have known, and should have anticipated, if he kept his course, as he says he did, and that a collision would occur with one or the other of the barges was manifest to one ever so inexperienced. The duty of the master of the tug to promptly put his helm hard a-starboard on discovering the Haynes at anchor on his starboard bow in such close proximity to him, and exert every possible effort to avoid the impending collision, was so manifest that its omission cannot be excused or palliated, particularly when the failure resulted in bringing about the accident; and, if it be said that with this effort the collision would nevertheless have occurred, it at least does not lie in the mouth of those whose duty it was to do all in their power, and who confessedly did nothing, to make this contention."

The testimony does not sustain the charge of fault with respect to lookout.

As to the Narragansett, assuming that she was justified in anchoring in the channel on account of the heating of her low pressure piston rod, the question to be determined is, whether she was properly there when the collision happened. The anchorage rules and regulations provide (Rules & Regulations relating to the Anchorage of Vessels in the Port of New York, page 7):

"(b) No vessel shall anchor in any of the channels except in cases of great emergency, and then as near the edge of the channel as possible, so as not to impede or interfere with the free navigation of the same, and only until such time as they can procure assistance; * * *."

The heating of the piston rod occurred about 8 o'clock in the morning. According to the testimony of the steamship's engineer, the rod was cool enough to proceed at 9 o'clock but instead of going on with the steamship, those navigating her remained at anchor to repack. This was not necessary to proceeding but it was convenient. Shortly afterwards the weather became so bad that it was more prudent to remain at anchor than to attempt to proceed but it appears that for some considerable time, half an hour at least, the steamship was able to go on and the weather was not unsuitable. For her failure to avail herself of this period to get off the anchorage ground, the steamship was in fault and should also be held.

Decree for the libellant against both vessels, with an order of reference.