## THE HILTON.

### THE ATLANTA.

(District Court, E. D. Virginia. March 27, 1914.)

COLLISION (§ 83*)—MOVING AND ANCHORED VESSEL—IMPROPER ANCHORAGE IN CHANNEL.

A collision in the Patapsco river between a steamship which had anchored because of dense fog near the port side of the channel, where she was allowed to swing to within 50 or 60 feet of the edge of the deep water channel, and a following steamship, *held* due to the faults of both vessels, the anchored vessel being in fault for anchoring within the channel where she obstructed the passage of other vessels, in violation of Act March 3, 1899, c. 425, § 15, 30 Stat. 1152 [U. S. Comp. St. 1901, p. 3543], when there was a sufficient depth of water outside of the channel, and the moving vessel being in fault for moving at too great speed in the fog.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 156, 167, 175; Dec. Dig. § 83.*

Collision rules, speed of steamers in fog, see note to The Niagara, 28 C. C. A. 532.]

In Admiralty. Suit for collision by the A. H. Bull Steamship Company, owner of the steamship Hilton, against the steamer Atlanta, the Chesapeake Steamship Company, claimant, with cross-libel. Decree finding both vessels in fault and dividing damages.

Hughes, Little & Seawell, of Norfolk, Va., and B. W. Wells, of New York City, for libelant.

Arthur D. Foster, of Baltimore, Md., and W. Leigh Williams, of Norfolk, Va., for respondent.

WADDILL, District Judge. These cases involve a collision that occurred on the morning of the 26th of December, 1912, in the waters of the Patapsco river, at the junction of the Brewerton and Cut-Off channels, between the steamship Hilton of the libelant company's line, and the steamer Atlanta of the Chesapeake steamship line. The Hilton is a large steamer of 3,102 tons gross, 2,433 net, 315'5" long, 46' beam, 22' deep; and the Atlanta, a fast passenger and freight steamer, 2,094 tons gross, 1,399 net, 225' long, 42' beam, and 14' deep. The two steamers were on the morning of the collision, as was also the steamship Howard of the Merchants' & Miners' Transportation Company, hereinafter referred to, proceeding up the river en route to Baltimore; the Hilton some half hour ahead of the others, on a voyage from Carteret, N. J., light, and the Atlanta from West Point, Va., laden with freight and passengers. A short time before the collision, the three vessels encountered fog in the Cut-Off channel, and

the Hilton, on account of the density of the fog, came to anchor on the port side of the channel, opposite buoy 17, and the other two vessels continued their courses in said channel, the Howard on the starboard of the Atlanta, and the latter ship between her and the port side of the channel. While thus navigating, the Atlanta came into collision with the Hilton, striking her on her starboard bow, causing the damages sued for. The collision occurred about 7 o'clock in the morning; the Howard at the time had dropped anchor on the opposite side of the channel from that of the Hilton.

The Hilton charges fault against the Atlanta in that she failed to keep a good lookout; that she was proceeding at an immoderate rate of speed under the circumstances; that she should have stopped and backed; that she did not keep to the starboard side of the channel; and that she failed to avoid colliding with the Hilton.

The Atlanta, on the other hand, insists that the Hilton's anchorage was a clear violation of the statute; that she should have anchored in other anchorage grounds in the vicinity; and that it was merely her own convenience that caused her to anchor where she did, creating an obstruction to navigation, and a menace to life and property of others lawfully using the channel; that she was without a sufficient anchor watch, and failed to adopt the reasonable precaution of dropping her stern as well as her bow anchor, to hold her parallel with the channel.

Upon the issues thus made, considerable testimony was taken by the parties respectively, and in the view taken by the court the case turns upon the correct determination of two questions: (1) Whether the Hilton at the time of the collision was anchored in a proper place, and safely and properly moored; and (2) whether the Atlanta was proceeding at an undue speed in the then prevailing weather. These will be considered in the order mentioned.

In determining the propriety of the place of anchorage of the Hilton, the fact of the existence of fog, which became denser as she proceeded up the channel, and that she, the forward ship, had been forced to anchor perhaps half an hour before the collision, must be taken into account, as must also the width and depth of the waters in and out of the channel at the scene of the collision. The Brewerton channel, as well as the Cut-Off channel, was about 600 feet wide, and 35 feet deep, but at the place of the accident, namely, at the intersection of the two channels, between buoys 15 and 19, the deep water on the port side, opposite buoy 17 where the collision occurred, outside of the channel was for some distance 17, 18, and 19 feet deep at low water. The collision happened during flood tide. The Hilton was light, drawing 7 feet forward, and about 15 feet aft, and might have anchored outside of the channel with safety and prudence, as well as either to the starboard side, where she should properly have been navigating, or preferably, if in the channel at all, in the middle thereof, there being room to have anchored there, leaving ample space for the free passage of shipping to lawfully navigate on either side. Sight is not lost of the fact that in a fog difficulty may frequently be encountered in knowing where to anchor; but that does not apply here, since the Hilton was in full view of and saw the buoys on her

port side, at and before the time she anchored, and knew where she was; and she was charged with knowledge as well of the width of the channel at the angle of intersection between the two, as of the depth of water outside the buoys, observable to her when she anchored.

From the testimony it appears that the three vessels while proceeding up the Cut-Off channel, about Seven Foot Knoll on a northwesterly course, and at a distance of some two miles from the scene of the accident, encountered fog which became thicker after passing buoy 15, the point of intersection of the two channels, and some half a mile from the place of collision. At buoy 15, the ascending vessels changed their courses so as to make the turn into the Brewerton channel. It seems evident to the court that on the morning in question, while both the Hilton and the Atlanta claim to have been navigating about midway of the channel, that they directed their courses by the buoys on the port side, and so continued until rounding buoy 15, as above indicated; and that neither vessel had observed the "narrow channel" rule, and kept to the starboard side of the channel; and this is certainly true as far as the Hilton is concerned, both as respects her navigation and anchorage on that side. The Atlanta was more excusable in what she did in ascending the channel, and at and about the time of anchoring, because the Howard that immediately preceded her was to her starboard, and it was necessary for her to take that fact into account, though no such condition existed with the Hilton. It was doubtless more convenient for the Hilton to drop her anchor where she did, but she should not have done so, having regard to the free and lawful navigation of the channel by others in the exercise of due care. She should have taken especially into account the fact that down-coming vessels belonged on that side of the fairway; and she should have known that if it was convenient for her ascending the channel in contravention of the starboard hand rule, to hug somewhat to the port side instead of the starboard side thereof, on account of the buoys, that others, as was true in the case of the Atlanta, might do as she did, and hence she should not have placed herself in the way of both ascending and descending vessels. Whatever there may be in the claim of the desirability, if not the necessity, of vessels ascending the Cut-Off channel in a fog, before reaching buoy 15, to navigate by the buoys on the port side, that should not serve to excuse the Hilton for her navigation and anchorage after rounding buoy 15, since then there were buoys on both sides.

The question of the proper anchorage of vessels is a difficult one to determine, and must be left somewhat necessarily to the discretion of the navigators, who frequently act in emergencies, and whose acts cannot be easily passed upon in the light of later events and other surroundings. The subject has received much consideration since the passage of the Act of Congress of March 3, 1899, c. 425, § 15, 30 Stat. 1152 (U. S. Comp. St. 1901, p. 3543), particularly in the courts of this circuit. The Hilton cites The Europe, 190 Fed. 475, 479, 111 C. C. A. 307. This is a fog case, and it will be observed that the Circuit Court of Appeals of the Ninth Circuit, relying on the case of The Oregon, 158 U. S. 186, 15 Sup. Ct. 804, 39 L. Ed. 943, considered

it as settled law that ocean-going vessels might lie at anchor in the nighttime, in the deep channel of a navigable river, but held that they must be so placed as not to prevent or obstruct the passage of other vessels, in violation of the act of Congress referred to. The Minnie, 100 Fed. 129, 40 C. C. A. 312, was a thick weather case, in the Circuit Court of Appeals of this circuit, and the duty to keep the channel open was clearly recognized. The Job H. Jackson (D. C.) 144 Fed. 896, affirmed by the Circuit Court of Appeals of this circuit in 152 Fed. 1021, 82 C. C. A. 332, was a fog case, the collision occurring in what might not be termed a river or narrow channel, and in which the place of anchorage was not a voluntary one, but made necessary as the result of damage sustained in a collision. The Caldy (D. C.) 123 Fed. 802, a decision of the District Court of Maryland, affirmed by the Circuit Court of Appeals of this circuit, in 153 Fed. 837, 83 C. C. A. 19, was a case of obstructing a narrow channel, not in a fog. In this case, it was decided that the purpose of the act of March 3, 1899, supra, was not intended to absolutely prohibit the anchorage of vessels in navigable waters, except where so doing would necessarily prevent the passage of other vessels, or obstruct them to such an extent as would make an effort to do so a dangerous maneuver. In the recent case in this court of the Margaret J. Sanford, The Strathleven (D. C.) 203 Fed. 331, 336, 338, and which has since received the approval of the Circuit Court of Appeals of this circuit in 213 Fed. 975, 130 C. C. A. 381 (February term, 1914) much consideration was also given to this subject, and the conduct and duty of navigators in coming to anchor fully commented upon.

Under the decisions above cited, the court thinks that the Hilton was clearly in fault in the manner and place of her anchorage. While navigators must necessarily be accorded much latitude in determining when and where to anchor, they must not fail to reasonably respect and observe the rules governing them, or the rights of others in what they do. In this case, there was a clear omission on the part of the Hilton to measure up to the requirements imposed upon her by law in the respects indicated. The ship was a large one, 315 feet long, and so anchored that when she swung her stern came to within 50 or 60 feet of the banks of the deep water channel. There was certainly no necessity for her so monopolizing the channel either because of the lack of other location, a crowded harbor, or of existing weather or other conditions. Moreover, she should, if necessary so to anchor where she did, have used both her stern and bow anchors in order to keep the vessel parallel to, or nearly with, instead of across, the channel.

Second. Coming to the consideration of the faults assigned against the Atlanta, and how far she should be held, if at all, responsible for the collision, the conclusion of the court is that at the time of the accident she was proceeding at an unreasonable rate of speed in a fog. She had been running under half speed of about 7½ miles an hour, for some time, it is true, and after turning buoy 15, and making her departure at the junction of the Brewerton and Cut-Off channels, the fog having become denser, upon hearing the bells of a ship ahead, which turned out to be the Hilton, she still further checked her speed, but not enough

to avoid the collision. She should sooner have reduced her speed, and if necessary stopped and reversed, and at all events should have been sufficiently in control of her movements as to have stopped, under the circumstances of this case, in time to avoid collision after sighting the Hilton. The fog was growing thicker all the time; the Howard was immediately ahead of and slightly to her starboard, and had or was about to come to anchor. The Hilton was only a short distance ahead and her fog bells heard, all of which should have caused the Atlanta to exercise the utmost care in the matter of her movements. The Umbria, 166 U. S. 404, 412, 417, 17 Sup. Ct. 610, 41 L. Ed. 1053.

It follows from what has been said that the collision came about as a result of the combined negligence of the two vessels, and a decree will be entered so ascertaining.