## THE HESPEROS.

## THE POCAHONTAS.

## UNITED STATES v. SANDAA et al.

(Circuit Court of Appeals, Fourth Circuit. February 17, 1920.)

No. 1749.

1. **Collision ⟨⟩71(3)—Care required of vessel anchoring in channel.**

Comp. St. § 9920, making it unlawful to anchor vessels in navigable channels "in such a manner as to prevent or obstruct the passage of other vessels," while not an absolute prohibition, makes it incumbent on a vessel anchoring in a channel to select a place where it will not close the channel, or unduly or unreasonably obstruct the passage of other vessels, and this burden extends, not only to actual use of the channel as a place to be at rest, but to the method of anchoring and the movements of the vessel when controlled or affected by her anchor.

2. **Collision ⟨⟩72(1)—Mutual faults of anchored and passing vessel.**

A large steamship, 489 feet long, which anchored in and at the side of the channel of Elizabeth river, where it was about 600 feet wide, and allowed her stern to swing slowly around with the tide at the time another vessel and tow were passing down on the other side, and failed to give warning of her movement to another steamship approaching from below, *held* in fault for a collision between them; the approaching vessel also *held* in fault for attempting to pass at a speed of from 5 to 8 miles, when the other vessels were in such position.

Pritchard, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk; Edmund Waddill, Jr., Judge.

Suit in admiralty for collision between the United States steamship Arethusa and the steamship Hesperos. Decree finding the Arethusa solely in fault, and the United States appeals. Modified and affirmed.

For opinion below, see 252 Fed. 858.

Hiram M. Smith, U. S. Atty., of Richmond, Va.

Edward R. Baird, Jr., of Norfolk, Va. (Baird & White, of Norfolk, Va., on the brief), for appellee E. I. Du Pont de Nemours Powder Co.

H. H. Little, of Norfolk, Va. (Hughes, Little & Seawell, of Norfolk, Va., on the brief), for appellees Sandaa, and Bruusgaard Kiosterud Dampskibsaktielsclskab.

E. E. Blodgett, of Boston, Mass. (Blodgett, Jones, Burnham & Bingham, and Albert T. Gould, all of Boston, Mass., on the brief), for appellee New England Coal & Coke Co.

Floyd Hughes, of Norfolk, Va. (Hughes, Vandeventer & Eggleston, of Norfolk, Va., on the brief), for appellee Lambert's Point Towboat Co.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

WOODS, Circuit Judge. We adopt the following excellent statement made by the District Court of the general situation under which the collision which is the subject of this appeal occurred:

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"On the morning of the 18th day of October, 1915, between 7 and 8 o'clock, a collision took place between the United States ship Arethusa, inward bound, the Hesperos, anchored on the eastern side of the channel of the Elizabeth river, opposite Craney Island Light, Norfolk, Va., and the barges Emilie and Cassie, being two of a tow of three barges then proceeding down the river on the western side of the channel, under the following circumstances:

"The Hesperos, a large ocean-going steamship, 389 feet long, 54 feet beam, and 24.6 deep, having loaded part of her cargo at the piers of the Norfolk & Western Railway Company at Lambert's Point, was taken out from the pier by the tug Pocahontas, of the Lambert's Point Towboat Company, and proceeded down the river to a point just below Craney Island Light, for the purpose of loading a consignment of dynamite, which was then on a barge at anchor on the flats, to the eastward of the place at which the Hesperos came to anchor. The Hesperos was followed down the channel by the tug Gwalia, towing three barges, lashed together, on a hawser of 25 to 30 fathoms. The tide was ebb, the weather good, and practically no wind. The tug and tow navigated to the western side of the channel, upon the Hesperos making its departure for the eastern side. The Hesperos was anchored over as close to the bank on the eastern side as she could get, and with the ebb tide her stern swung slowly to the westward, coming round to the tide, her engines being kept slow ahead, for the purpose of keeping her bow to the bank of the channel.

"After being anchored, the Arethusa, 330 feet long, 43 feet beam, and drawing 23 feet of water, was observed coming up the river below Boush Bluff, a mile or more away, about midchannel, and apparently at full speed. The Arethusa and the tug Gwalia exchanged passing signals of two blasts of their whistles, indicating a starboard to starboard passage. The Arethusa approached the Hesperos, with apparently no change of helm or speed, and the Hesperos sounded danger signals, which the Arethusa did not hear. The Arethusa maintained her course and speed, running until a short time before the collision, according to her master's testimony, at half speed of from 5 to 6 knots an hour, and immediately before and at the time of the collision had slowed down to slow speed of between 3 and 4 knots an hour, and when within 2 ships' lengths of the Hesperos she put her wheel hard aport, with a view of going to starboard, but not in time to avoid coming into collision with the Hesperos, striking the stern of the latter ship on its port quarter, doing considerable damage to that ship, and seriously injuring herself, tearing away, among other things, the ship's bridge, steering gear, etc. The Arethusa then swung abruptly to starboard, and ran some 600 to 800 feet over to the westward side of the channel, and into the easternmost of the three barges, the Emilie, sinking her, and driving with such force against the second barge, the Cassie, as to cause it considerable damage."

No error is assigned as to the finding of the District Court that the tug Pocahontas and the tug Gwalia and the barges in tow were without fault. The United States, owner of the Arethusa, assigns error in the finding that the Arethusa was responsible for the collision and that the Hesperos was without fault. The conflict of testimony on many points would make the case difficult of solution, if we could escape the conviction that the officers of both the Arethusa and the Hesperos convict themselves of negligence proximately contributing to the collision.

The Norfolk Harbor rules, framed under state authority, altogether forbid anchoring in the channel in these words:

"Vessels entering the harbor and intending to come to anchor, or dropping out from wharves or docks preparatory to departure, must anchor under direction of a harbor master, *and are forbidden to anchor in the channel.*"

The federal statute (Comp. St. § 9920) provides:

"It shall not be lawful to tie up or anchor vessels or other craft in navigable channels *in such a manner as to prevent or obstruct the passage of other vessels or craft.*"

The District Judge, thoroughly familiar with navigation of Norfolk Harbor, found that the local requirement that a vessel must anchor under the direction of a harbor master, if ever enforced, has become obsolete. It was intimated in The Margaret J. Sanford, 213 Fed. 975, 130 C. C. A. 381, though the point was not necessarily involved in the decision, that the local harbor rule is not an absolute prohibition to anchor in the channel, but "impliedly extends to anchoring *so as to obstruct the channel.*" If the local rule is an absolute prohibition, and not inconsistent with the qualified prohibition of the federal statute, then the burden would be on the Hesperos to show, not only that her anchoring in the channel did not contribute to the collision as a proximate cause, but that it could not have done so. The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148. But that point it is not necessary to decide here, since we think the testimony clearly establishes the fault of the Hesperos under the federal statute, and under the rule of reason also, even if there was no state statute or local regulation on the subject.

[1] The meaning of the federal statute is too clear for discussion. It is thus well expressed by Judge Waddill in the Margaret J. Sanford (D. C.) 203 Fed. 331, 336:

"The true meaning of the act, the court thinks, is that under it the duty is not negatively, but affirmatively and positively, imposed upon vessels coming to anchor in navigable channels, to see that they do not under any circumstances, accidents excepted, 'prevent or obstruct the passage of other vessels or craft'; not, of course, that they shall not anchor in such channels at all, but that when they anchor therein, outside of an established anchorage ground, they shall so anchor, and in such method, as not to close, or unduly or unreasonably prevent and obstruct, the passage of other vessels or craft."

Precisely the same meaning was expressed by this court in that case, 213 Fed. 975, 130 C. C. A. 381, and in The Minnie, 100 Fed. 129, 40 C. C. A. 312, and The Caldy, 153 Fed. 837, and by other courts in The Europe, 190 Fed. 475, 111 C. C. A. 307, and The City of Birmingham, 138 Fed. 555, 559, 71 C. C. A. 115.

Obviously this burden, imposed by the statute, not to endanger vessels by preventing or obstructing their passage, extends not only to actual use of the channel as a place to be at rest, but to the method of anchoring and the movements of the vessel when controlled or affected by her anchor. When a vessel intends, not only to stop in a channel in which she is moving, but to anchor and swing around until she is lying with one-third of her length obstructing the channel, she is bound to give notice to approaching vessels of her movement or intention, or warn them not to approach until she has completed her unusual maneuver. Care to give notice of such movements to other vessels should be commensurate with the danger to them, not only from the actual obstruction of the channel, but from their necessary lack of accurate knowledge of the anchoring vessel's movements and in-

tention. The fundamental rule of safety at sea is that a vessel on seeing another approaching must give notice of any movement out of the ordinary which may control or affect the course or safety of the other vessel.

[2] Application of these familiar rules to the conduct of the Hesperos makes her fault evident. This was the critical situation about which there is no dispute: The Hesperos, a large steam vessel 389 feet long, had cast her anchor, and for about 20 minutes had been swinging slowly into the channel about 600 feet wide, until she had reached an angle of about 60 degrees to the channel, one-third of her length extending into it. Her movement was necessarily accelerated as she swung with more and more of her broad side against the tide. By this movement of the Hesperos, the Gwalia, a tug towing three barges abreast, also going down the channel and taking up about 100 feet of it, had been forced to take the western side. The Arethusa, a large steam vessel, was seen, a mile to a mile and a half away, coming up the channel. It was evident to the masters of all the vessels that in passing each other they would be in such close proximity—so nearly in line across the channel—that all should navigate with care, that each should give the others notice of his intentions, and take careful notice of the movements and signals of the others. The danger of the situation was so obvious to the master of the tug Gwalia that he grounded his vessel in the effort to give the Arethusa room to pass.

The master of the Hesperos admits that he paid little attention to the other vessels or their signals. He did not respond to the passing signal of the Gwalia, which he should have known was intended to notify him of the intention of the Gwalia and her tow to pass him. He had no recollection of even hearing the meeting signals of the Arethusa and the Gwalia. By his own admission he gave no signal, and none was given from his ship, except several short blasts of the whistle, which the master of the tug Pocahontas says he himself gave when the Arethusa was a mile or more distant. If this signal was given, it was not heard on the Arethusa. The oncoming of the Arethusa at a high speed without response to the danger signal indicated clearly to the master of the Hesperos that the danger signal had not been heard on the Arethusa, and that her master did not appreciate the critical situation brought about by the action of the Hesperos. In this situation it seems clear that, if the master of the Hesperos had given any attention to his duty, he would have repeated and continued to repeat his danger signals, warning the Arethusa to stop until he had completed his movement, and his ship had become stationary. He knew accurately how his ship was anchored and the rapidity of her swinging movement. It was obvious to him that the master of the Arethusa could perceive his movement only in a general way, and was very likely to make a serious miscalculation. So it turned out; the miscalculation of the master of the Arethusa was one of the chief causes of the collision, for he did not and could not know the Hesperos was anchored or under steam until it was too late.

The negligence of the Hesperos in anchoring and swinging into the channel without adequate signals to the Arethusa of the critical situa-

tion, so that it would slow down or stop until the movement was completed, was one of the proximate causes of the collision.

We agree with the District Court that the Arethusa was negligent. Her master saw that the Hesperos was in an unusual position and doing an unusual thing, and he was at fault in approaching and trying to pass between the Gwalia and her tow and the Hesperos at a speed of from 5 to 8 miles an hour. It was his duty to keep his vessel under complete control until he had ascertained for himself more accurately the conditions of which the Hesperos had negligently failed to warn him. Being of opinion that both the Hesperos and the Arethusa were at fault, a decree will be entered accordingly.

Modified.

PRITCHARD, Circuit Judge, dissents.