## THE EUROPE.

### (Circuit Court of Appeals, Ninth Circuit. September 5, 1911.)

### No. 1,957.

1. COLLISION (§ 69*)—MOVING AND ANCHORED VESSELS—ANCHORING IN CHANNEL.

An ocean-going vessel may lawfully lie at anchor in the nighttime in the deep channel of a navigable river if not so placed as to prevent or obstruct the passage of other vessels, in violation of Act March 3, 1899, c. 425, § 15, 30 Stat. 1152 (U. S. Comp. St. 1901, p. 3543), and the words "prevent or obstruct" in such statute are positive words indicative of limited restraint and of legislative intent to not interfere with the right use of waterways by imposing an absolute or unreasonable prohibition.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 69.*]

2. COLLISION (§ 77*)—VESSEL AT ANCHOR—DUTY OF WATCHMAN.

It is not a fault constituting a legal ground of liability for a collision for the watchman on a ship at anchor to fail to give warning by sounds or signals to an approaching vessel when the weather is clear, and therefore the absence of a watchman from the position from which he could best see an approaching vessel cannot be charged as a contributing cause of a collision.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 140–149; Dec. Dig. § 77.*]

3. COLLISION (§ 75*) — INLAND RULES — CONSTRUCTION — ANCHOR LIGHTS — "HULL."

In article 11 of the inland rules (Act June 7, 1897, c. 4, 30 Stat. 98 [U. S. Comp. St. 1901, p. 2879]), which requires a vessel 150 feet or more in length when at anchor to carry a light forward "at a height of not less than twenty and not exceeding forty feet above the hull," etc., the word "hull" includes the forecastle deck.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 105–121; Dec. Dig. § 75.*]

4. COLLISION (§ 71*)—ANCHORED AND MOVING VESSELS—FAULT.

A harmless fault, even when a positive mandate of the statute has been disobeyed, cannot be made the basis of a recovery of damages nor palliate the fault of another which does inflict the injury, and the fact that the riding lights of a vessel at anchor were not at the exact height prescribed by the rules will not render her liable for a collision where the lights were clearly visible for the required distance, and the failure of the moving vessel to see them was due solely to the negligence of her navigators.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 101; Dec. Dig. § 71.*]

5. COLLISION (§ 154*)—SUIT FOR DAMAGES—COSTS—EXPENSE OF BOND.

Where a foreign vessel libeled for collision was exonerated and recovered damages on a cross-libel, the cost of obtaining a bond for her release, including not only the premium paid to the bonding company, but also the necessary incidental expenses incurred, was properly allowed her as costs.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 308; Dec. Dig. § 154.*]

6. COLLISION (§ 136*)—SUIT FOR DAMAGES—DAMAGES—DETENTION OF VESSEL.

Demurrage allowed a vessel for the time she was detained for repairs after a collision may properly be based on evidence showing her average daily earnings during the preceding five years.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 136.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from the District Court of the United States for the District of Oregon.

Suit in admiralty for collision by the Western Transportation & Towing Company, as owner of the steamer Annie Comings, against the French barque Europe, Theophile Rollier, master, claimant. Decree for respondent, and libelant appeals. Affirmed.

For a statement of this case the following is copied from the appellant's brief:

"This is an appeal brought by the Western Transportation & Towing Company from a decree of the District Court of the United States for the District of Oregon, sitting as a court of admiralty. On the evening of December 30, 1907, the river steamer Annie Comings, owned and operated by the appellant, collided with the French barque Europe, anchored in the Willamette river near the city of Portland, resulting in the sinking and total destruction of said steamer, and damage to said barque in certain parts of its rigging. The appellant filed its libel against said barque Europe for the loss of said Annie Comings and her cargo, and thereafter the master of the Europe filed a cross-libel for the damage sustained by said barque.

"At the time of the collision the Europe was anchored in the deep-water channel of the Willamette river, and in the usual track of vessels plying up and down said river. While at anchor in this position, up to the time said collision occurred, the forward anchor light of the Europe, which is a vessel 303 feet in length, was placed at a height of 17 feet and 6 inches above the forecastle deck, which in this case was about 100 feet in length extending back of the foremast, the light aft being placed at a height of about 8 feet lower than the one forward. The forward light was hung under the forestay leading from the Europe's foretopmast to the knighthead, said forestay consisting of two wires bound together and being about 4 inches in circumference, and being also bound about with chafing-gear to the extent of about 9 inches in diameter extending down even with the center of said light, which as it hung was from 14 to 18 inches back of said forestay. In this position, said forward light was also on a level with the end of the jib boom, around which sails were furled to a width of about 2½ feet in diameter, at a distance of about 65 feet in front of said light.

"When the collison occurred, and for some time prior thereto, all of the officers and crew of the Europe were below deck at what the chief officer refers to as a French dinner, excepting the boatswain, who was on the main deck between the forecastle and poop decks, which were each 7½ feet higher than the main deck. When he felt the shock of the collision, the boatswain climbed to the top of the forecastle, and discovered the Annie Comings swinging across the bow of the Europe. The captain of the Europe followed the boatswain to the forecastle deck, and, to relieve the pressure on his ship, gave orders to let go two more shackles of the anchor chain (two shackles having been already released by the shock of the collision), which was done, and the ship prevented from going adrift, although it was carried down the river for some distance, and across the deep-water channel toward the west shore. The Annie Comings was proceeding down the river loaded with machinery, and was running at her average speed. The pilot was at the wheel, and a lookout was stationed forward on the passenger deck. Both were keeping a watch ahead. The pilot first discovered a light shade on the water straight ahead in his course, and immediately put the wheel over to swing clear of it. When the object appeared, the pilot did not know it was a ship, but instantly discovered that it was from the electric lights on the lower deck of the steamer shining on her hull. There was no light visible on the ship from the pilot's position in the pilot house, and the lookout could see none from his position on the forward passenger deck. The ship was discovered by both pilot and lookout at almost the same instant. When the ship was discovered, the steamer was meeting her 'head on' within one degree. The steamer struck within about three seconds after the ship was discovered. There was a strong current in the river, and, when the wheel of the steamer was put over, it swept the steamer around with her broad-

side against the bow of the ship, where she hung until broken in two by the strong current and sunk, one part of her hull being carried down the Columbia river about 15 miles.

"The fault charged in the libel against the Europe is very clearly and succinctly stated in the opinion of the District Court, as follows: 'It is alleged that the Europe was anchored in the fairway, and directly in the course of vessels plying the river. This is set down as a fault against the ship. But the especial complaint is made that she was so anchored without proper riding lights, as required by law, so disposed and situated as to give notice and warning of her position and presence in the stream, and without a proper anchor watch on duty before and at the time of the collision. As to the lights, it is specifically alleged that at no time did the Europe exhibit a large white light, visible around the horizon, situated in the proper place, or at the proper distance above the deck, to give suitable warning to boats plying to and fro upon the river.' The fault charged against the Annie Comings by the cross-libel is also stated in the opinion of the District Court, as follows: 'As showing the fault of the Annie Comings, it is further alleged that while descending the river she was so carelessly navigated by an attempt to cross the bow of the Europe in such close proximity with the current then running in the river as to foul the Europe's bowsprit, causing the hogchains of the Comings to part, by reason whereof she broke in two and sank, at the same time rendering damage to the Europe. Such are the issues presented by the pleadings.' The testimony introduced upon the trial herein presents no disputed questions of fact, except upon the point as to whether or not the forward anchor light was a bright or a dim light, some of the witnesses testifying that it was a very bright light, while others testified that it was a very dim light.

"The District Court in its opinion and decree held the barque Europe to be without fault in the collision and sinking of said Annie Comings, and that the Annie Comings was solely at fault in said collision in failing to observe and distinguish the anchor lights of the Europe."

Cake & Cake, for appellant.
Williams, Wood & Linthicum, for appellee.

Before MORROW, Circuit Judge, and HANFORD and DIETRICH, District Judges.

HANFORD, District Judge (after stating the facts as above). By the record it appears that the learned district judge before whom this case was tried made a painstaking and exhaustive analysis of the evidence upon which the case was submitted, from which he evolved the following conclusions:

"Finally, I conclude that the Europe was not anchored in an improper place, but was so anchored as to require of her great care in protecting other, navigating vessels against collision; that she carried two lights, of requisite size and dimensions, so placed, and without substantial obstruction, that they could be seen for a distance of two miles or more; that the forward light was not carried to the proper height, by 2½ feet, required by the statutory inland rules for a vessel at anchor of the class of the Europe; that the aft light was not hung at a point 15 feet below the forward light, nor more than 8 feet lower; that the Europe had a watchman on board at the time of the collision, but not in a position just then to discover the approach of the Annie Comings; that the navigators on the Annie Comings either saw or ought to have seen the lights on the Europe and distinguished them as riding lights upon a vessel at anchor, and that they were grossly negligent in allowing their boat to come into collision with the latter vessel; that the position of the lights on the Europe contrary to the regulations of law manifestly could not have contributed as a cause to the collision; and that the Europe was supplied with a competent and proper watch, and, if not upon the forecastle at the time, the fault, if it be a fault, could not in

all reasonable probability have contributed to the cause of the accident. I therefore find the Annie Comings liable, and the Europe free from fault."

In making these conclusions, consideration was given to the testimony of witnesses in connection with knowledge of the general physical geography surrounding the place of the collision, derived from examination of a purported blue print, copy of a government chart, confirmed, no doubt, by the local knowledge which the judge in common with all intelligent inhabitants of his state necessarily possesses. The general direction in which the river flows and its width and depth were matters proper to be considered. We deem the criticism of the decision on the ground that exact accuracy of the map was not proved to be unmerited, and after a careful study of all the evidence we find the quoted conclusions, as to all questions of fact, to be true and accurate.

The appellant urges for a reversal or modification of the decree on the following grounds:

(1) At the time of the collision the Europe was lying at anchor in the deep channel of the Willamette river between the city of Portland and the town of Linnton.

(2) The rules for the prevention of collisions applicable to harbors, rivers, and inland waters of the United States (30 U. S. Stat. 98; 2 F. S. A. 176; Pierce's Fed. Code, § 2026 [U. S. Comp. Stat. 1901, p. 2879]), prescribes that vessels of 150 feet or more in length, to which class the Europe belongs, when anchored at night shall carry in the forward part of the vessel at a height of not less than 20 feet, and not exceeding 40 feet above the hull, a white light so constructed as to show a clear uniform and unbroken light visible all around the horizon at a distance of at least one mile, and another such light at or near the stern of the vessel, at such a height that it shall not be less than 15 feet lower than the forward light, which requirement was not complied with on the part of the Europe, for that her forward light was hung at an elevation not greater than 17 feet and 6 inches above her hull, and her stern light was not more than 8 feet lower; and said forward light was obscured by the forestay to which it was suspended and by the jib boom on which sails were furled and which extended upwards so that its tip end was on a level with said light.

(3) The watchman on board the Europe on duty at the time of the collision was on the main deck, in which position he could not observe the approach of vessels coming down the river, and he failed to do anything to give warning of her presence, or to attempt any maneuver which might possibly have prevented the collision.

(4) The District Court included in its decree as part of the taxable costs a large and unusual item of expense incurred in obtaining a bond to release the Europe from attachment.

[1, 2] The argument based upon the first and third grounds, as stated above, is completely refuted by the decision of the Supreme Court in the case of The Oregon, 158 U. S. 186.[1] On the authority of that case, we hold the law to be settled that an ocean-going vessel may lawfully lie at anchor in the nighttime in the deep channel of a

[1] 15 Sup. Ct. 804, 39 L. Ed. 943.

navigable river, if not so placed as to prevent or obstruct the passage of other vessels, in violation of the act of Congress prohibiting such obstruction. 30 U. S. Stat. 1152; U. S. Compiled Stat. 1901, 3543; 6 F. S. A. 817; Pierce's Fed. Code, § 11105. We also hold that the words "prevent or obstruct," in this statute, are positive words indicative of limited restraint and of legislative intent to not interfere with the right use of waterways by imposing an absolute or unreasonable prohibition; and that it is not a fault constituting a legal ground of liability for the watchman on a ship at anchor to fail to give warning by sounds or signals to an approaching vessel, when the weather is clear. It would have been impracticable for the watchman on duty in a position to observe the approach of the steamer towards the bow end of the Europe to have operated her rudder so that the current of the river would change her position; and he would not have been justified in paying out the anchor chain so as to change the position of the ship in order to get out of the way of the approaching steamer until it was clearly apparent that she was about to ram his vessel; and, as the on-coming vessel was going under steam at full speed and with a strong current, the discovery of danger by an alert watchman would necessarily have been too late to avert a collision by lengthening the anchor chain, and, inasmuch as failure on the part of the watchman to do any of the things suggested cannot be charged as a fault, we cannot regard his absence from the position best adapted for efficient service as a contributing cause of the accident.

[3] One of the contested points in the case is in the question whether the rule requiring the forward light to be at an elevation not less than 20 feet above the hull requires in a vessel constructed like the Europe that the elevation shall be not less than 20 feet above the forecastle deck, or whether the measurement shall be from the main deck. This court approves the interpretation of the rule given by the district judge; that is, that the word "hull" includes the forecastle deck, and that, to strictly comply with the requirements of the rule, the light should be elevated not less than 2½ feet higher than the light of the Europe was at the time of the collision, and the stern light should be at least 15 feet lower than that elevation. This fault in the detail of placing the forward and stern lights respectively at the prescribed elevations is the only important circumstance distinguishing this case from the case of the Oregon, supra. The difference between the two cases even in this particular cannot be very great, for in its opinion in that case the Supreme Court said:

"The International Code. (Rev. Stat. § 4233 [U. S. Comp. St. 1901, p. 2895]), in force at this time, provided (rule 10) that 'all vessels, whether steam vessels or sail vessels, when at anchor in roadsteads or fairways, shall, between sunset and sunrise, exhibit, where it can best be seen, but at a height not exceeding twenty feet above the hull, a white light in a globular lantern of eight inches in diameter, and so constructed as to show a clear, uniform, and unbroken light, visible all round the horizon, and at a distance of at least one mile.' This rule was substantially, if not literally, complied with. The light was of the regulation size, and, if it were hung a little over 20 feet above the hull, the difference was entirely immaterial, as it is found to have been seen by the pilot of the Oregon, though mistaken for the Coffin Rock light."

Conceding that a fault on the part of the Europe has been shown, the vital question to be decided in this case is: Was that fault a contributing cause of the injury? In his testimony the pilot of the libelant's steamboat stoutly maintained that he did not see lights on the Europe until he climbed upon her forecastle after the collision, but, if her lights were visible so as to have been seen by him at a distance of one mile, they were sufficient to indicate the presence of the Europe, and the failure of the steamboat to avoid her was inexcusable. The attempt to account for the failure of both the pilot and the steamer's lookout to see both or either of the lights on the Europe upon the theory that the forward light was obscured by the forestay to which it was suspended and the wrapping upon it, and by the jib boom with the furled sails thereon, is a complete failure. To accept that theory, it is necessary to assume that while the steamer was traversing a distance of one mile or more her pilot and lookout were both constantly in positions where, looking ahead, their eyes were in direct line with the keel of the Europe so that the tip end of her jib boom constituted a screen between their eyes and the light. That assumption necessarily involves the rejection of the pilot's testimony with respect to the course on which the steamer was running. The Europe was anchored so that the current of the river kept her jib boom pointing up stream, and, if it caused her to swing, her jib boom would not constitute a screen unless observers on the steamer constantly varied their positions in exact correspondence with the swinging of the ship. Of course, it would be impossible for two men to step in exact unison with the movements of an invisible object. The course of the steamer was at an angle with the ship's keel, for the steamer was on an oblique course from a point on the east side of the river towards the lights of Linnton on the west side. Therefore it is certain that the jib boom of the Europe and her forward light could not both be in range with the keel of the steamer and the Linnton lights towards which she was pointing, the light being 65 feet abaft the end of the jib boom. It seems to be hardly necessary to comment upon the argument based on the forestay and the chafing stuff wrapped upon it. The thickness or width of the stay was not sufficient to make a screen, and the wrapper was above the light, so that it could not affect the vision of a person on a lower level. The fact appears by the testimony of both of them that the pilot and the lookout were immediately prior to discovering the Europe intent in looking for and trying to avoid drift timber floating in the water. From this and the facts that the collision occurred and that they deny having seen the lights, which certainly were upon the Europe, there arises a necessary inference that they were negligent in not looking forward far enough and sweeping a space wide enough and high enough to see a light hung 17 feet and 6 inches above the forecastle deck of the Europe. The New York, 175 U. S. 204, 20 Sup. Ct. 67, 44 L. Ed. 126.

[4] This court concurs with the District Court in the conclusion that the lights on the Europe were sufficient to indicate her position, and that the insufficient elevation of her forward light was not a contributing cause of the collision. A harmless fault, even when a posi-

tive mandate of a statute has been disobeyed, cannot be made a basis for the recovery of damages in a civil suit, nor palliate the fault of another which does inflict an injury. On this point the Supreme Court in the case of The Blue Jacket, 144 U. S. 390, 12 Sup. Ct. 718, 36 L. Ed. 469, said:

"The provision of article 24 of the act of March 3, 1885, is that a vessel is not to be exonerated from the consequences of any neglect to keep a proper lookout. It does not say that a vessel shall, because of not keeping a proper lookout, be visited with the consequences of a collision. If the collision does not result as a consequence of neglecting to keep a proper lookout, the vessel is not thereby made responsible for the consequences of the collision. * * *"

[5] Referring to the fourth of the appellant's contentions, we deem the decision of the District Court allowing the expense of obtaining a bond to release the Europe from custody to be in strict accordance with the demands of justice. It is a serious matter to detain a ship by judicial process in a cause not founded upon a just claim, although prosecuted in good faith and, therefore, lawful. The cost of the bond was high, but necessarily so. The Europe is a foreign ship, and the amount of the bond was necessarily large because the libelant sued for a large amount. Forty-one thousand dollars was the amount of the security required. By competent evidence it was proved that the claimant was diligent in endeavoring to obtain a bond promptly and at a minimum of expense, and that the amount allowed, $1,269, was actually expended. In that sum there is included the premium paid to a bonding company and the expenses incurred in arranging with bankers in France and in New York to furnish the indemnity which the bonding company exacted. To these additional expenses objections are specially urged. It is said that such expenses are unusual and unnecessary, and that the District Court improperly received proof of the expenditure by a deposition taken after the trial to which letters were appended without authenticating evidence of their genuineness. The answer to these strictures is that it has always been usual for courts to mulct the defeated party in a lawsuit for the costs of the litigation, including the necessary disbursements of his adversary. Formerly, when security or bail was exacted, the litigant was obliged to importune his friends to become sureties, but, since the coming of corporations organized and capitalized to furnish security for compensation, it has become unnecessary for individuals to assume obligations for the accommodation of friends, and the instances are rare in which an individual can be prevailed upon to jeopardize his fortune by becoming a surety for a large amount. Hence the necessity of paying cash to obtain a bond to release a ship from legal custody. And payment of the premium is not the only burden which necessity imposes. Bonding corporations are not like insurance companies. They sell their credit only; they do not assume obligations without being fully indemnified. In this case the expense of providing indemnity was as necessary as payment of the premium. The deposition taken in France after the trial was in response to a request from the judge for additional information with respect to the contested additional expenses. The persistence of the opposition justified the request for more light.

190 F.—31

The deposition was given under oath and it authenticates the letters annexed to it, which deponent produced in compliance with demands therefor in the appellant's cross-interrogatories, as well as in the direct interrogatories. That is to say, he identified them as the papers which he was required to produce.

[6] From consideration of the best evidence obtainable the District Court included in its decree, as part of the damages, demurrage at the rate of $101.99 per day for 18 days. The reasonableness of the estimate made for the purpose of fixing the demurrage is apparent, having in mind the size of the Europe and her class, and it has not been seriously questioned, but the appellant complains because a deposition setting forth statements of voyages made during. a period of five years showing her earning capacity was received and considered. There.was no better method of estimating the loss to her owner by detention for the particular days during which the damages caused by the collision were being repaired than the calculation which the court made, based on proof of daily expenses and estimated average daily earnings for the preceding five years. The Tremont (D. C.) 160 Fed. 1016, affirmed by this court in 161 Fed. 1, 88 C. C. A. 304. The deposition was competent proof for the purpose.

The Decree of the District Court is affirmed. .