**BROWN & WILLIAMSON TOBACCO CORPORATION, Libellant,**

and

Liggett & Myers Tobacco Company, R. J. Reynolds Tobacco Company, the American Tobacco Company, and A. Fantis, Intervening Libellants,

v.

THE ANGHYRA, her engines, boilers, etc., and Hellenic Lines, Ltd., Respondents.

HELLENIC LINES, LTD., Cross-Libellant,

v.

BROWN & WILLIAMSON TOBACCO CORPORATION, Liggett & Myers Tobacco Company, and A. Fantis, Cross-Respondents.

No. 6666.

United States District Court
E. D. Virginia,
Norfolk Division.

July 18, 1961.

Baird, Crenshaw & Lanning, Norfolk, Va., and Sprague & Peck, New York City, for libellants and cross-respondents.

Edward S. Ferebee, Norfolk, Va. and Bigham, Englar, Jones & Houston, New York City, for intervening libellants and cross-respondents.

Seawell, McCoy, Winston & Dalton, Jett, Sykes & Coupland, Norfolk, Va., and Hill, Betts & Nash, New York City, for respondents, claimants and cross-libellant.

WALTER E. HOFFMAN, District Judge.

Reaching the end of a long road of litigation following the exhaustion of appeals, the parties are before the Court for the determination of taxable costs and the question of interest.

In the opinion of this Court, 157 F. Supp. 737, the libellant and intervening libellants were allowed a recovery for damaged tobacco shipped in respondent's vessel from Bulgaria, Turkey, and Greece to Newport News and Norfolk. As to this issue the decree was reversed. Hellenic Lines, Ltd. v. Brown & Williamson Tobacco Corp., 4 Cir., 277 F.2d 9. Certiorari was denied, Brown & Williamson Tobacco Corp. et al. v. Hellenic Lines, Ltd. et al., 364 U.S. 879, 81 S.Ct. 168, 5 L.Ed.2d 102.

Brown & Williamson, the libellant, was allowed a recovery for three bales of tobacco dropped overboard, the value of which, according to the stipulation of proctors, was $127.00. Liggett & Myers was likewise granted a recovery for one bale of tobacco similarly damaged at a value of $28.35. The intervening libellant, A. Fantis, recovered for a shipment of olive oil in tins valued, according to stipulation of proctors, at $706.71. The recovery as to these items was affirmed by the Court of Appeals.

On its cross-libel against Liggett & Myers, Brown & Williamson and A. Fantis, Hellenic Lines was permitted to recover for demurrage which, according to stipulation of proctors, is apportioned as follows:

| | |
|---|---|
| Liggett & Myers | $16,153.59 |
| Brown & Williamson | 6,874.47 |
| A. Fantis | 287.62 |
| Total | $23,315.68 |

Apparently no appeal was taken on the issue of demurrage. In any event it was not the subject of any discussion in the opinion of the Court of Appeals.

As Fantis was a successful party in the litigation, no costs may be assessed against him. While he did not prevail on the demurrage question, the issue was one of law, and no evidence, other than in the form of exhibits, was presented. Fantis is entitled to his proctors' docket fee, any costs incurred by reason of the filing of his intervening libel, and the cost of the deposition of the witness, Courtney.

Proctors have agreed that interest for a period of three years will be allowed on the cargo and demurrage claims. They have likewise agreed that the mileage for the witness, Cocks, should be limited to 100 miles and the per diem for Cocks and Douglas will be reduced to four days. In the libellants' bill for costs, they have stipulated that the fees of the United States Marshal should be eliminated.

There remains for consideration the problem of assessing the remaining costs. Should the respondents be permitted to recover a full bill of costs? Should the libellants, other than Fantis, be allowed a partial recovery of their cost in light of the small portion of the litigation which resulted in a favorable decision? Are the respondents entitled to the cost of collateral required at the time of the posting of the bond for the release of the vessel, and, if so, should this be limited to the rate of exchange?

[2] The respective amounts originally claimed by the tobacco libellants were as follows: Brown & Williamson, $516,234.50; Liggett & Myers, $200,000; R. J. Reynolds, $60,000; American Tobacco, $5,000. From this it will be seen that R. J. Reynolds and American Tobacco

recovered nothing; and Brown & Williamson and Liggett & Myers recovered $127 and $28.35 respectively, with demurrage charges in favor of Hellenic Lines against Brown & Williamson and Liggett & Myers more than offsetting these minor items.

■ The libellants all cooperated in the presentation of their claims and the prosecution of this action. With minor exceptions, the defense to one constituted a defense to all. It seems clear that the respondents are entitled to a full bill of costs against the libellant and the intervening tobacco libellants. Title Guaranty & Trust Co. of Scranton, Pa. v. Crane Co., 219 U.S. 24, 31 S.Ct. 140, 55 L.Ed. 72; American Tobacco Co. v. Goulandris, D.C.S.D.N.Y., 173 F.Supp. 140, 1959 A.M.C. 2484; Middleton & Co. (Canada), Ltd. v. Ocean Dominion S. S. Corp., 2 Cir., 137 F.2d 619; Benedict on Admiralty, Vol. 3, p. 233. Moreover, the mandate of the Court of Appeals, in affirming in part and reversing in part, directed that *costs on appeal* be paid by the libellant and intervening libellants. The mandate is at least persuasive in determining how costs should be assessed by the trial court. American Smelting & Refining Co. v. Black Diamond S. S. Corp., D.C.S.D.N.Y., 188 F.Supp. 790.

The tobacco claimants rely upon American Tobacco Co v. The Katingo Hadjipatera, D.C.S.D.N.Y., 115 F.Supp. 269. In Katingo we are confronted with a limitation proceeding in which the owner sought to avail himself of certain rights granted by Congress and the expenses, under such circumstances, must fall upon the owner. Martin Marine Transp. Co., Inc. v. Jakobson & Peterson, Inc., 2 Cir., 135 F.2d 325, 328. Actually the owner recovered a full bill of costs as the court required the charterer to indemnify the owner with respect to the proportion of the claimants who were successful. The contention in this case that respondents' bill of costs should be reduced by 60% because respondents prevailed wholly against American Tobacco Company and R. J. Reynolds is without merit.

Turning to the bill of costs filed by the tobacco interests, this is not a case in which the respondents conceded any liability, although during the course of trial the Court indicated that respondents were obviously liable for the Fantis claim and the bales of tobacco dropped overboard. Respondents, relying upon the doctrine of inherent vice, resisted vigorously any right of recovery. Admittedly any allowance for costs to the tobacco interests must be somewhat arbitrary in the exercise of the court's discretion. Nevertheless, as pointed out in The Katingo, supra, the amount of the claim in a consolidated action should not determine the allocation of costs. Eliminating the fees to the Marshal, the Court finds that, after the payment in full of costs to Fantis, the remaining libellants are entitled to 25% of their bill of costs.

■ When the vessel was arrested in 1941, a release bond in the sum of $493,000 was finally agreed upon. This bond was continued in force until August 23, 1953, when a letter of undertaking was substituted. The total cost of the bond, without collateral, would have been $57,498.60. Respondents claim only $51,242.05 to be taxed as costs; the items being computed as follows:

1. The sum of $26,284.30 being the premium paid to National Surety Corporation, which amount the tobacco claimants concede to be taxable.

2. The sum of $10,962.75 paid to the Bank of New York for issuing its letter of credit to National Surety Corporation, which is contested by the tobacco claimants under the theory that it represents the cost of collateral incurred by reason of respondents' lack of credit.

3. The sum of $13,995 paid to National Provincial Bank, Ltd., for giving an indemnity agreement to the Bank of New York, which is likewise contested as representing the cost of collateral and, even if taxable, the rate of exchange should be in pound sterling.

National Surety Corporation had declined to post the release bond until it received full collateral for the undertak-

ing. During World War II there was little doubt but that no bonding company would assume the responsibility for such a bond without collateral. The bond was posted upon receipt by the surety of a cashier's check in the sum of $26,500 from P. G. and Anna P. Callimanopulos, together with a letter of credit from the Bank of New York in the sum of $466,500, which letter of credit was issued pursuant to an arrangement between the latter bank and National Provincial Bank, Ltd. In consideration of the collateral being given, National Surety Corporation reduced its charges to 1% for the first three years and ½ of 1% annually thereafter.

General Admiralty Rule 7, 28 U.S.C., provides:

> "If costs shall be awarded by the court to either or any party then the reasonable premiums or expense paid on all bonds or stipulations or other security given by that party in that suit shall be taxed as a part of the costs of that party."

The tobacco libellants contend that the words "premiums *or* expense" preclude any consideration of "expense" when the cost of the bond premium is taxable. While this contention may have some merit in instances where the expense of the collateral, when added to the bond premium, exceeds what would have been the ordinary cost of the bond at accepted rates, the position taken in the instant proceeding is untenable. As was said in The Europe, 9 Cir., 190 F. 475, 481:

> "And payment of the premium is not the only burden which necessity imposes. Bonding corporations are not like insurance companies. They sell their credit only; they do not assume obligations without being fully indemnified. In this case the expense of providing indemnity was as necessary as payment of the premium."

Libellants rely upon Aegean (Shipbrokers) v. Henriksen's Rederi A/S, D.C. Mass., 165 F.Supp. 939, wherein Judge Aldrich expresses some doubt as to the correctness of the decision in The Europe,

supra. Of course, the language is dictum as the court there held that, under General Admiralty Rule 7, the words "premium" and "expense" relate to actual disbursements and not to legal interest which the respondent was required to pay.

It is true that where a bond has been given for the full amount required, any possible loss to a claimant from having to give collateral to the bonding company is not ordinarily recoverable by the claimant as damages or taxable costs, Theofano Maritime Co. v. 9,551.19 Long Tons, etc., D.C.Md., 122 F.Supp. 853, 857, but where cash is deposited in lieu of a stipulation or bond, interest not exceeding the amount of the premium which would have been paid for a bond may be taxed as costs in lieu of the bond premium. Benedict on Admiralty, 6th Ed., Vol. 3, § 431, p. 227; The Wolsum, 5 Cir., 14 F.2d 371; Savas v. The S.S. Capt. John C., D.C.E.D.Va., 182 F.Supp. 641, 643.

We believe that a proper rule to follow is that the taxable cost should not ordinarily exceed the amount which would have been paid for a bond premium, but that where there is an actual expenditure in arranging for collateral and the total amount thereby expended, whether by way of bond premium or cost of collateral, either or both, does not exceed the normal cost of the bond premium, the expenditure is taxable.

For the period of eight years prior to 1950, the sterling rate was $4.02 per pound. During these years and until the bond was cancelled in August, 1953, the Bank of New York received an annual payment of $933 in dollars from the Bank of England which served as agents for respondents' underwriters. In like manner the amount paid annually to the National Provincial Bank, Ltd., was $1,166.25. Until 1950 the underwriters reimbursed the Bank of England in sterling at the rate of $4.02. On September 18, 1949, sterling was devaluated by 30% and thereafter the Bank of England was reimbursed at a sterling rate of $2.80, thus resulting in a greater number of pounds being given to the Bank of England for

reimbursement purposes. In any event, the expense for the collateral was incurred and paid in the United States in dollars. Unlike The West Arrow, 2 Cir., 80 F.2d 853, where there was a breach in a foreign country and damages were stipulated to be paid in a foreign currency, the expenses here were incurred in dollars and paid in dollars by the Bank of England. To hold with the theory advanced by the tobacco libellants would result in a diminution of payments made for the collateral to the extent of 30% for eight years prior to 1950. Since the obligation was one to be paid in the United States, there arose a liability in dollars. Zimmermann v. Sutherland, 274 U.S. 253, 255, 47 S.Ct. 625, 71 L.Ed. 1034; Cf. Hicks v. Guinness, 269 U.S. 71, 46 S. Ct. 46, 70 L.Ed. 168; Die Deutsche Bank Filiale Nurnberg v. Humphrey, 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383; 20 Fordham Law Review 333.

A final decree may be presented in accordance with this memorandum.