**AMERICAN HAWAIIAN VENTURES, INC., formerly Hawaiian Sumatra Plantations Limited, Libelant,**

v.

**M. V. J. LATUHARHARY, her tackle, apparel, furniture, engines, cargo of rubber, general cargo and other cargo lately laden on the M. V. J. Latuharhary,**

**Djakarta Lloyd Lines, a corporation, and all persons intervening for their interest therein for the course of action civil on information and belief alleges as follows: Respondents.**

**Civ. A. No. 576-65.**

United States District Court
D. New Jersey.

Feb. 10, 1966.

On Motion for Taxation of Costs
May 2, 1966.

Paul Narkin, Honolulu, Hawaii, Belli, Ashe & Gerry, San Francisco, Cal., Jeffers & Mountain, by Thomas Bitar, Morristown, N. J., Speiser, Shumate, Geoghan & Krause, by Peter J. Magee, New York City, for libelant.

Delson & Gordon, by Carl Slater, New York City, Mead, Gleeson, Hansen & Pantages, by Alastair J. Sellar, Newark, N. J., for respondents P. N. Djakarta Lloyd and M. V. Johannes Latuharhary.

## OPINION

COOLAHAN, District Judge:

This is a libel in admiralty brought by American Hawaiian Ventures, Inc., (Hawaiian) against Djakarta Lloyd Lines [1] (Djakarta) as respondent in personam and against the motor vessel M. J. V. Latuharhary, as respondent *in rem*. Hawaiian seeks damages for an alleged tortious conversion.

The gravamen of the libel is that the Government of the Republic of Indonesia by virtue of its actions during 1959 wrongfully confiscated rubber plantations and related property of the libelant situated in and about the Island of Sumatra. It is further alleged that Djakarta is a "fully owned entity of the Government of Indonesia" and that in turn the Latuharhary is owned by Djakarta.

Respondents raise six separate exceptions to the libel. The first five of these also were pleaded in a substantially identical action involving the same parties brought in the United States District Court for the Southern District of California. Those five exceptions were as follows:

"1. The wrong of which libelant complains does not lie within the admiralty jurisdiction of this Honorable Court.

2. The libel states no cause of action sufficient to constitute a cause of action in admiralty.

3. The libel states no cause of action against the *in rem* respondent M. V. J. LATUHARHARY.

4. The libel states no cause of action against the *in personam* respondent P. N. Djakarta Lloyd.

5. In any event, this Court is barred from granting Libelant the relief it seeks by reason of the sov-

---

1. For the record, respondent Djakarta notes that its correct title is P. N. Djakarta Lloyd and not Djakarta Lloyd Lines, but it is clear which corporation is referred to in the captioned action.

ereign immunity of the Republic of Indonesia." Exceptions to Libel, Doc.No. 65–687–WB. (S. D.Cal., filed May 11, 1965).

Each and every one of these exceptions was sustained and the libel dismissed by Order of the District Court, Order of May 14, 1965 (S.D.Cal.).

In the instant Motion respondents repeat those five exceptions and, in addition, plead the earlier Order as a bar to the present action under doctrines of res judicata and collateral estoppel.

Upon review of the briefs, the authorities cited therein, and the oral argument upon the Motion, this Court is of the opinion that the first five exceptions now pleaded were properly granted by the California District Court in the original action and should be sustained.

■ The clearest fact about the action is that it is not one properly within admiralty jurisdiction since libelant's grievances do not arise to a significant degree from any maritime tort or relationship. Although libelant alleges that loading boats used to transport rubber from the plantations to waiting freighters were also seized, he concedes this was quite incidental to the basic expropriation of the plantations themselves.

■ It is libelant's contention, however, that this Court, sitting in admiralty, possesses broad power to hear non-admiralty matters if they relate to admiralty questions in a manner analogous to a court of equity's broad "clean up" powers to hear related matters of law. Libelant's reliance on Benedict and on Swift & Co. Packers v. Compania Colombiana, 339 U.S. 684, 70 S.Ct. 861, 94 L. Ed. 1206 (1949) is misplaced in both instances. The cited passage in Benedict states that, "admiralty courts are courts of limited jurisdiction confined to admiralty matters, but within those confines they have the capacity of a court of law and in certain respects the capacity of a court of equity." 1 Benedict 148, § 71 (6th Ed. 1940); but that passage goes on to rebut the libelant's contention: "Admiralty having obtained

jurisdiction *will not*, except in cases of limitation of liability [a special problem not pertinent here], *dispose of non-maritime matters for the purpose of doing complete justice after the manner of a court in equity*." Id. at 149 (emphasis supplied).

The *Swift* case illustrates an admiralty court's ability to exercise broader powers within the confines of an admiralty question. The lower court had ruled on a subsidiary issue of the alleged fraudulent transfer of the libeled vessel, an issue directly affecting the available relief. The Supreme Court approved this disposal of non-maritime matters, but stressed that the transfer issue was but a slight incident of libelant's major claim, "a claim incontestably in admiralty." 339 U.S. at 691, 70 S.Ct. 861.

Beyond dispute the present action is overwhelmingly one for conversion on Sumatra proper of non-maritime property, a conversion having no flavor of admiralty whatsoever. The added assertion of incidental seizures of loading vessels, even if not subject to defects discussed below, is insufficient to work some magical conversion of this suit into one in admiralty.

■ The third and fourth exceptions denying any specific cause of action against either respondent are equally well taken. The libel *in rem* of the Latuharhary must be supported by a valid maritime lien against that vessel. Such a lien cannot be established since no maritime contract with it nor injury of which it was the instrumentality is alleged. 1 Benedict 617 (6th Ed. 1940). The ship was in no way involved in the acts of which Hawaiian complains.

■ Nor is the assertion that some of its present cargo may be rubber which was seized in the alleged conversion some six years ago sufficient to support a maritime lien. The connection between the alleged conversion is too remote from the activities of the vessel to invoke admiralty jurisdiction. Schoening v. 102

Bags of Jute, 132 F.Supp. 561 (E.D.Pa. 1955).

For the libel *in personam* against Djakarta, no maritime lien against the Latuharhary need exist if other grounds of admiralty jurisdiction are established —the vessel's seizure for purpose of that claim would merely be an attachment of Djakarta's property. However, the effort to find an alternative basis for the action against Djakarta raises an insurmountable dilemma.

If Hawaiian asserts the action is against Djakarta as an independent shipping company, no maritime relationship exists between the parties; there is no assertion that Djakarta participated in the seizure of libelant's property, on the high seas or anywhere else. Not only are both Djakarta and the Latuharhary strangers to that seizure, they were not even in existence at the time!

On the other hand, if libelant claims Djakarta is the mere instrumentality of the Republic of Indonesia whose property may be reached to satisfy a claim against that Nation, the Court is faced with respondents' fifth exception based on the claim of Indonesia's sovereign immunity. The Republic has not yet been joined as a party respondent, but in its brief libelant asserts, "[W]e are dealing here with the Indonesian Government." Libelant's Brief, p. 3.

Respondents contend that apart from any question of this Court's admiralty jurisdiction over the subject matter, to the extent Indonesia is the real party in interest the Court lacks personal jurisdiction because of Indonesia's immunity to suit without its consent. The Court finds this exception was also properly granted in the California proceeding.

To be sure, the defense of sovereign immunity is not always allowed in actions involving the operation of non-military vessels by a foreign government. Victory Transport, Inc. v. Comisaria General, 336 F.2d 354 (2nd Cir. 1964) cert. denied 381 U.S. 934, 85 S. Ct. 1763, 14 L.Ed.2d 698 (1965). In that case the Court of Appeals explained that

the privilege of immunity is strictly construed and granted only to a foreign state's public or sovereign acts (*jure imperii*), and not to its commercial activities (*jure gestionis*), 336 F.2d at 358. The Spanish Ministry of Commerce had charted a shipping vessel and the contract was disputed. Since the Court deemed the charter an act *jure gestionis,* and since the State Department made no special request, the defense of sovereign immunity was denied.

In addition, however, that opinion listed several classes of actions typically considered *jure imperii* and afforded sovereign immunity when the country does not consent to be used. Specifically included in that list was expropriation of the kind involved here. 336 F.2d at 360.

In reply, libelant asserts that the Sabbatino Amendment to the 1964 Foreign Assistance Act, § 620(e)(2), 78 Stat. 1013 (1964), deprives Indonesia of any claim to sovereign immunity. This is incorrect. In Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), the Supreme Court ruled that American Courts were precluded by the Act of State Doctrine from determining whether Nation's expropriation of American property violated international law. All the "Sabbatino Amendment" does is to overrule that decision and direct the courts to pass on this question unless the State Department requests that it refrain therefrom.

Both the case and the Amendment dealt only with the scope of inquiry permissable once the suit was heard. There was no question in *Sabbatino* of the Court's jurisdiction to hear a suit against Cuba, because an agent of Cuba had appeared voluntarily as plaintiff to claim proceeds of the sale of sugar which had been expropriated. Thus, the Amendment does not bear on the threshold question of whether this Court's jurisdiction over Indonesia would be defeated by its right to sovereign immunity for acts *jure imperii*. See *Victory Transport,* supra, 336 F.2d at 362, 363 [compare Headnotes (11) and (12),

which distinguish the *Sabbatino* problem from the jurisdictional one]. The answer to that question must be in the negative. National City Bank of New York v. Republic of China, 348 U.S. 356, 75 S.Ct. 423, 99 L.Ed. 389.

Finally, respondents' sixth exception, made here for the first time, pleads the California dismissal as a bar to the instant suit. This Court agrees with the District Court for Southern California that on the basis of the first five exceptions discussed above the respondents were, and are still entitled to a dismissal. But even were this Court to disagree and to deny those exceptions, the California dismissal would be dispositive of these proceedings.

 The purpose of res judicata is to end litigation. A judgment on the merits in the first suit bars a second suit between the same parties. If the second action involves different parties the first suit will not bar the second action but will be conclusive as to all issues which were determined in the first suit; this is the principle of collateral estoppel.

For the effect of res judicata to attach the decision must be final and on the merits. Restatement, Judgments § 41 (1942). It is Hawaiian's contention that the Order of Dismissal in the California libel was not such an adjudication on the merits. Apparently, libelant's theory is that the dismissal was based strictly on a finding that no admiralty jurisdiction over the subject matter had been pleaded, and that the dismissal was not equally based on the other sustained exceptions. Libelant contends that a judgment on demurrer for failure to plead subject matter jurisdiction is not a judgment on the merits and will not bar libelant's attempt to cure the defect and sue again. It claims that the addition in the second libel of the express allegation that boats were seized on the navigable waters and high seas in and around Indonesia cures the defect by alleging an act of piracy which "is *prima facie* a maritime tort". Libelant's Brief, p. 5.

In the first place, this attempt to cure the defective pleading of a cause in admiralty is inconsequential. As noted previously that seizure was a very slight incident of the expropriation of property on land and the entire matter is not one for a court in admiralty.

 Secondly, the attempted cure is itself defective. Benedict does indicate that every seizure by force on the high seas is *prima facie* piracy, and hence a maritime tort. But it is unmistakably clear from a reading of the cases and authorities that such seizure must be done without color of authority and with the spirit of universal hostility *(animo forandi)* against the world. See Black, Law Dictionary and Bouvier, Law Dictionary, and cases cited in 1 Benedict 371, § 139 (6th Ed. 1940). Libelant admits in the instant case that the seizure was made by the Government of Indonesia within its territorial borders and under color of authority. Libelant's Brief, p. 2.

 Finally, and most important the basic considerations of estoppel do apply to the effect of the earlier dismissal upon this action. The restatement acknowledges that a defective pleading of jurisdiction may not bar plaintiff's cause of action if he can correct the defect before suing upon it again. Restatement Judgments § 50, comment c, (1942). However, even where the first action terminates in a manner not considered judgment upon the merits and not precluding another suit upon the action, the first action is still determinative of the questions actually determined. Mellon v. Hirsch, 8 F.R.D. 250 (D.Md.) aff'd 71 F.2d 127 (4th Cir. 1947). Since the suit is between the same parties this effect cannot strictly be called "collateral estoppel"; the Restatement calls this effect "direct estoppel", Restatement Judgments § 49 comment b, (1942). Some courts ambiguously reach the same results by declaring that prior judgments based on jurisdictional grounds were on the merits, e. g. Angel v. Bullington, 330 U.S. 183, 67 S.

Ct. 657, 91 L.Ed. 832 (1947). The important point is that the issues previously decided are conclusive upon the parties, even if, as a formal matter, the plaintiff is not barred from bringing suit a second time.

That is precisely the situation here. The various allegations which form the basis of libelant's claims against the two named respondents were fully considered in the California proceeding and that court expressly granted "each and every exception." The slight change in the second bill does not make any difference when weighed against the basic defects of this action.

Judge Tuttle's excellent analysis of a similar situation perfectly describes why Hawaiian is barred from prosecuting this action.

"The cardinal principle is that the second action is precluded unless the new allegations supply a material deficiency of the complaint. * * * 'Developments in the Law—Res Judicata', 65 Harv.L.Rev. 818, 826. * * *

Plaintiff insists that the first judgment was not 'on the merits' and should not bar this subsequent action. The dismissal of the first action can be ascribed to *a lack of jurisdiction or to the absence of a substantive claim; actually the ground of dismissal amounted to both of these.* But even if regarded as a decision not on the merits, the first action precludes a new adjudication of the question actually decided, although it does not 'bar the cause of action.' [Citing Mellon v. Hirsch and the Restatement Sec. 49]. * * * [W]hether the first decision was on the merits or not is not important here, since [the Court] regard *the two actions as not materially different, and the question actually decided in the first action disposes of the present one as well.*" (Emphasis supplied.) Estevez v. Nabers, 219 F. 2d 321, 323 (5 Cir. 1955).

For the above reasons, each and every one of the respondents' exceptions numbered (1) through (6) are hereby granted and the libel is dismissed. Respondents' request for cost is hereby denied.

Let counsel for the respondents submit an appropriate Order.

## OPINION

## ON MOTION FOR TAXATION OF COSTS

I. This is a motion by respondents for the taxation against the libellant of certain pre-trial costs incurred in the captioned lawsuit. Following the libel of the M/V Latuharhary, the respondents filed a Bill of Exceptions to the libel. The Court sustained each of these Exceptions and dismissed the libel on February 10, 1966. American Hawaiian Ventures v. M/V Latuharhary, supra, p. 628 (D.N.J., Civ.No. 576–65)

The factual background of the libel is fully set forth in that initial opinion. It suffices to repeat that the libellant sought to recover damages for the alleged illegal seizure of its Sumatra rubber plantations by the Republic of Indonesia. The basic grounds of dismissal were lack of admiralty jurisdiction; failure to state a claim; and, independently, the *res judicata* effect of a similar dismissal in the United States District Court for the Southern District of California.

Respondents now seek to recover the costs of certain security arrangement made to release the vessel. They rely primarily upon General Admiralty Rule 7, 28 U.S.C. and upon their contention that libellant's demands for security, as well as the second libel itself, were unreasonable, burdensome and harassing.

II. Upon the arrest of the vessel in the Port of Newark, the respondents sought to effectuate the vessel's release as soon as possible. In addition to the immediate expenses occasioned by delay of the voyage, the respondents were concerned because this was the first trip of a P. N. Djakarta Lloyd vessel to the United States and this was the second time in a short period that it had been arrested by the libellant.

Counsel for libellant refused to accept either a letter of indemnity from the respondent itself or a release bond just covering the amount of the claim. He initially demanded a bond in the sum of $3,000,000. even though his damage claim was only $1,500,000; after a summary hearing before Judge Augelli of this Court, the libellant agreed to a $2,-000,000. bond which was then obtained from the National Surety Corporation. However, National Surety declined to post the release bond until it had been secured against any default. Such a letter of indemnification was obtained by respondents' insurance broker in Europe from Baring Bros. & Co., a London bank, whereupon the bond was issued and the ship was released.

Respondents urge that the full costs incurred in freeing the vessel be taxed. Those costs totalled $67,812.50, as follows:

1. The sum of $7,812.50 being the premium paid to National Surety for the bond itself.

2. The sum of $60,000. being the indemnification charge paid to Baring Bros. for its letter of guaranty to National Surety.

Receipts for both items are attached to the moving papers, as is an affidavit from National Surety that a $2,000,000. bond normally carries a premium of $20,000., but that the premium in question was reduced some $13,000. by virtue of the indemnification. However, in this regard it should also be noted that the respondents apparently could not have procured such a normal bond at a $20,000. premium in this matter, since absent the aforementioned letter of indemnity, National Surety was unwilling to bond them at all.

 III. Such a request for costs presents the Court with two questions: first, do the circumstances and equities of this action warrant imposition of any costs on the losing party; and second, which items of the movant's costs should be taxed.

 The first question clearly is a matter within this Court's broad discretion. On the basis of the entire factual situation appearing from the record, I conclude it must be answered in the affirmative.

The libellant had already tied up the vessel in the California libel. In that action the Court had granted each of the exceptive allegations—with the exception of *res judicata*—raised here. The ship was then attached in Newark at the start of the Memorial Day weekend when it would obviously be very difficult to effectuate its release. Libellant was forewarned by respondents that its demands would produce extremely large security costs, for which respondents would seek recovery in light of the libellant's tenuous attempt to overcome the California dismissal.

To be sure, the libellant was entitled to a second day in court if a substantially different tack had warranted a new action. Further, even though this Court found the changes in the new complaint insubstantial and insufficient to cure the patent lack of admiralty jurisdiction, *American Hawaiian* Ventures, supra, at p. 627 (Feb. 10, 1966), libellant's right to try to convince the Court of the contrary is indisputable. But having persisted in that unlikely effort and failed, it must be prepared to shoulder the unreasonably heavy burden of costs which resulted.

IV. It is not completely clear how much discretion the Court has in deciding which items to assess, once the decision to award some costs is made. There is authority indicating that the discretion is limited to either granting or withholding the disbursements specifically authorized by statute, but that no discretion extends to the awarding of items not enumerated therein. 3 Benedict, Admiralty, § 435, p. 229 (and cases cited). However Benedict notes that even in deciding which items are taxable the Court may depart from the normal rules "for circumstances of equity, hardship, or oppression." Ibid.

This, of course, is precisely the situation which respondents urge exists here.

Nonetheless, the respondents rely primarily on the basic statutory authority for admiralty costs, General Admiralty Rule 7, 28 U.S.C. which provides:

"If costs shall be awarded by the court to either or any party then the reasonable premiums or expenses paid on all bonds or stipulations or other security given by that party in that suit shall be taxed as a part of the costs of that party."

The alternative phrasing, "premiums *or* expenses" has elicited a variety of views on which items may be taxed. Many combinations of bonds with other types of security occur in admiralty proceedings. When a vessel, cargo, or other *res* is attached, a party may release it before judgment by depositing cash or other security with the clerk or by giving a bond or stipulation or a combination of the two. In turn a bonding company may require further collateral from the party whom it bonds in the form of cash, securities or indemnification by a third party.

In the simplest case, where cash is deposited in lieu of a bond, the general rule is that in lieu of the premium, Rule 7 allows taxation of interest charges incurred to the extent they do not exceed the amount of premium which would have been paid for an equivalent bond. 3 Bennedict Admiralty § 431, p. 227; The Wolsum, 14 F.2d 371 (5th Cir. 1925); Savas v. The S.S. Capt. John C., 182 F.Supp. 641 (E.D.Va.1959).

Where both a bond premium and charges or expenses on other collateral are claimed, it has been suggested that under Rule 7 the two are mutually exclusive and cannot both be granted in the same proceeding. Aegean (Shipbrokers) v. Henriksen's Rederi A/S, 165 F.Supp. 939 (D.Mass.1958). In Theofano Maritime Co. v. 9,551.19 Long Tons, etc., 122 F.Supp. 853 (D.Md. 1954), the Court held that once a bond was posted, any additional collateral given the bonding company by the claimant was a matter solely between them and the costs of posting such collateral were not taxable. 122 F.Supp. at 857.

Other courts have indicated that premiums and expenses incurred in securing the bonding company may both be recovered where the latter actually produces a reduction in the normal premium. For example, in Brown & Williamson Tobacco Corp. v. The Anghyra, 198 F.Supp. 321 (E.D.Va.1961) noted the contention that "the words 'premium *or* expense' preclude any consideration of 'expense' when the cost of the bond premium is taxable." The Court concluded that this contention while perhaps relevant in other circumstances, was untenable in the situation before the Court. There, the sum of $51,242.05 in costs was claimed. This included:

1. A bond premium of $26,284.50
2. A charge of $10,962.75 paid a New York bank for indemnifying the bonding company.
3. A charge of $13,995.00 paid a London bank for indemnifying the New York bank.

This sum of $51,242.05 was less than the $57,498.60 total premium which would have been charged for the bond in the absence of the indemnification. The Court taxed the full amount on its belief that:

"[a] proper rule to follow is that the taxable cost should not *ordinarily* exceed the amount which would have been paid for the bond premium, but that where there is an actual expenditure in arranging for collateral and the total amount thereby expended, whether by way of bond premium or cost of collateral, either or both, does not exceed the normal cost of the bond premium, the expenditure is taxable." 198 F.Supp. at 324. (Emphasis supplied.)

The decision apparently proceeds on the theory that even if Rule 7 makes bond premiums and other security expenses alternative items, if the added security reduces the premium, its costs should be taxable *pro tanto* as an indirect premium.

While the respondents at Bar rely heavily on *Brown & Williamson,* the instant case presents a significantly different situation in that the total of the premium actually paid and the indemnity charge far exceeds the premium normally charged for such a bond without indemnification. Thus, the case comes squarely within the exception made by the Court in *Brown & Williamson,* in referring to the view that premiums and expense for other collateral could not both be granted:

> " * * * this contention may have some merit in instances where the expense of the collateral, when added to the bond premium, exceeds what would have been the ordinary cost of the bond at accepted rates * * *"
> 198 F.Supp. at 324.

In the case at Bar, the indemnity charges were $60,000. while the bond premium was only reduced approximately $12,000. But the rule given in *Brown & Williamson* was offered as a limitation on costs which should not "ordinarily" be exceeded. The question of costs presented here is hardly ordinary. The cost of the letter of indemnity was almost eight times the premium paid. This disproportion raises an unusual question on which the Court has found no case precisely in point.

V. Nevertheless, the Court is of the opinion that the full $67,812.50 should be taxed as costs for the following reasons:

■ First, the touchstone of any statutory taxation of costs, including those under Rule 7, must be a standard of reasonableness. The common sense behind the rule in *Brown & Williamson* is akin to the notion to avoidable damages in the law of contracts. The respondents should not be allowed to recover the cost of avoidable consequences incurred in posting security if they could have spent less for a premium without indemnity than they ultimately spent for both the reduced premium and the indemnification.

However, obtaining two million dollars in cash or stocks on the eve of a holiday weekend would have been no mean feat for even a domestic corporation, let alone the New York agency office representing the foreign corporation Djakarta Lloyd.

Libellant offered no evidence to contravert the respondents' contention that no bond would have been issued to them without the letter of indemnity. Nor should it be assumed that respondents would lightly incur a $60,000. cost that they could not be sure of recovering. The Court sees little sense in applying a rule which refers to the "normal premiums" charged in the absence of indemnity when dealing with a situation where no such bond was available.

Second, the Court has already decided that the libellant's knowing imposition of hardship and burdensome security arrangements on the respondents warrant taxation of costs. In light of that conclusion it would be unreasonable and self defeating to exclude the lion's share of such costs from consideration and award only the $7,812.50 premium.

It may be argued that the libellant is not responsible for the respondents' credit rating or for the fact that being a new and foreign corporation it could not obtain bond without indemnity. But it is equally true that the libellant necessitated the bond, and hence indirectly necessitated the incidental costs thereof. In The Europe, 190 F. 475, (9th Cir. 1911) the Court awarded both the bond premium and the charge for a letter of indemnity from a foreign bank to a ship owner whose vessel had been attached in Oregon. On appeal, the Circuit Court affirmed in language quite pertinent to this action:

> "It is a serious matter to detain a ship by judicial process in a cause not founded upon a just claim, *although prosecuted in good faith and, therefore, lawful.* The cost of the bond was high, but necessarily so. The Europe is a foreign ship, and the amount of the bond was necessarily large because the libelant sued for a large amount. * * * Bonding

corporations are not like insurance companies. They sell their credit only; they do not assume obligations without being fully indemnified. *In this case the expense of providing indemnity was as necessary* as payment of the premium. 190 F. at 481. [Emphasis supplied.]

■ Third, the Court concludes that the fact this libel was dismissed, *inter alia,* for want of jurisdiction enhances rather than diminishes the Court's discretion to tax extraordinary items of costs.

Section 1925 of Title 28 U.S.C. provides:

"Except as otherwise provided by Act of Congress, the allowance and taxation of costs in admiralty and maritime cases shall be prescribed by rules promulgated by the Supreme Court."

One such Act is to be found in 28 U.S.C. § 1919 which states:

"Whenever *any* action or suit is dismissed in any district court for want of jurisdiction, such court may order the payment of *just* costs." [Emphasis supplied.]

Section 1919 has been held applicable to admiralty actions.[1] See The Commercial Guide, 23 F.2d 135 (D.D.C.1927) dealing with the predecessor provision of § 1919.

VI. In the present libel, not only did this Court dismiss the libel for want of jurisdiction, but also the direct estoppel effect accorded the dismissal in California was based on that Court's ruling of no jurisdiction.

In light of all these considerations, and in view of the libellant's failure to show any adequate reason for its burdensome security demands, the respondents' full claim for costs in the aforesaid amount of $67,812.50 is hereby granted.

Let an appropriate order be submitted.

---

1. This statutory authority would seem to supercede the statement by Benedict, based on Nineteenth Century cases, that costs are not taxable if the libel is dismissed for want of jurisdiction. 3 Benedict, Admiralty § 434.